## NATIONAL LABOR RELATIONS BOARD v. STAFFORD et al.

### No. 14741.

United States Court of Appeals
Eighth Circuit.

Aug. 11, 1953.

Margaret M. Farmer, Attorney National Labor Relations Board, Washington, D. C. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, and Norton J. Come, Attorney, Washington, D. C., on the brief), for Petitioner.

Ransom A. Ellis, Jr., Springfield, Mo. (Neale, Newman, Bradshaw, Freeman & Neale, and Flavius B. Freeman, Springfield, Mo., on the brief), for respondents.

Before GARDNER, Chief Judge, and RIDDICK and COLLET, Circuit Judges.

COLLET, Circuit Judge.

The National Labor Relations Board found that respondents had violated the National Labor Relations Act. It now petitions this court to enforce its order against respondents.

The charges against respondents were that they had violated the Act by

(a) violating Section 8(a)(1) thereof, 29 U.S.C.A. § 158(a)(1), by interfering with the right of the employees to form, join or assist labor organizations, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection;[1]

(b) violating Section 8(a)(3) of the Act[2] by discouraging membership in the union by discriminatively discharging those who engaged in concerted activities;

(c) violating Sections 8(a)(1) and 8(a)(5)[3] of the Act by refusing to bargain with a representative of the majority of its employees, and granting wage increases without dealing through the union.

The Trial Examiner found that respondents discharged the employees in question on July 31, 1950, both because of the fact they joined a union on that day and also because on the morning of July 31st they engaged in a concerted protest of a proposed wage adjustment. The Board gently rejected the finding that the employees were discharged because of their union affiliation, stating that the record did not justify a flat finding to that effect, but adopted the Examiner's finding that the discharges were because of concerted activities.

The Trial Examiner also found that respondents refused to bargain with the union as the representative of the employees and had discouraged membership in the union by vilifying the union, inquiring about membership in the union, refusing to bargain with it, granting unilateral pay increases to individual employees, and discharging employees because of their membership in the union and their concerted activity. The Board rejected the findings that respondents vilified or criticized the union, or intended to influence nonmembership in the union by inquiries about union affiliation, and, as heretofore stated, rejected the finding that discharges were on account of union affiliation, but found that the effect of respondents' refusal to bargain with the union, granting unilateral pay increases, and discharges for concerted activity was to discourage concerted activity, discourage union membership, and hence violated the Act.

Much of respondents' brief is devoted to the argument that the evidence did not support the Examiner's finding that respondents knew of the employees' affiliation with the union, and hence they could not have been discharged because of their union affiliation, citing cases such as N. L. R. B. v. Ray Smith Transport Co., 5 Cir., 193 F.2d 142, in support of that argument. Since the Board did not base its order on a finding to that effect, that argument is beside the point. But the question whether there was substantial evidence to support the finding that the discharges were on account of concerted activities by the discharged employees is serious and decisive. Respondents' defense to the charges was that the employees were laid off solely be-

1. "§ 158. Unfair labor practices
"(a) It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C.A. § 158(a) (1).

2. "§ 158. Unfair labor practices
"(a) It shall be an unfair labor practice for an employer—
*   *   *   *   *
"(3) by discrimination in regard to hire or tenure of employment or any term

or condition of employment to encourage or discourage membership in any labor organization: Provided, *  *  *." 29 U.S.C.A. § 158(a) (3).

3. "§ 158. Unfair labor practices
"(a) It shall be an unfair labor practice for an employer—
*   *   *   *
"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C.A. § 158(a) (5).

cause of lack of work, economic and financial reasons.

Respondents' business was a private trucking business. It consisted largely of the purchase of cattle and hogs on order from packing industries and transporting the purchased animals to the plants of respondents' customers. The business was a family partnership consisting of the father and four sons. During the period now in question, fourteen drivers and assistant drivers, called helpers, were employed. They operated the trucks owned by the partnership. In addition there were four men employed in the shop or garage for maintenance and repair purposes, and one office girl. The shop men and the office girl were employed on a straight-time basis. The drivers and helpers were not. The latter were paid strictly on a mileage basis. Their pay depended entirely on the number of miles driven each week. And the number of miles driven depended entirely on the amount of business each week. Prior to 1949 the operators of the trucks consisted only of a driver for each truck. In the early part of 1950 the Interstate Commerce Commission ordered respondents to employ a helper for each driver for all trips of ten hours or more. This necessarily increased the number of employees engaged in the operation of the trucks. To help meet the added expense of hiring the helpers, respondents, in April, 1950, lowered the rate of pay of the drivers, when accompanied by helpers, from 3.5 cents to 3 cents per mile. The helpers were paid 1.5 cents per mile.

Respondents had been engaged in their business for a number of years. The business was erratic, but ordinarily the fluctuations were seasonal. Business ordinarily started to decline about the beginning of the year and reached its lowest point in July, then increased, reaching its highest point in September and October. The drivers were assigned trips in rotation. A board was kept in the garage. The first driver back from a trip put his name at the top of the board each week, the others below in the order they came in. The following week they went out in that order. Seniority of employment was recognized only in the assignment of the equipment. New trucks were assigned to the drivers oldest in service. In 1946, during the slack season, several regular drivers were laid off, in order that the remaining might have adequate work and income. In succeeding years, prior to 1950, there were no layoffs. During the slack seasons in those years the drivers weathered the slumps by sharing the few trips there were.

In January and February, 1950, the business showed a substantial increase over that for the same period in 1949. In February, 1950, respondents ordered some new trucks. Either in January or February, 1950, respondents' largest customer put salaried buyers in respondents' territory, and the business of that customer was soon practically entirely lost to respondents. That customer had previously accounted for approximately 70 per cent of respondents' hog business on order. Beginning in March, as compared with corresponding months in 1949, the business fell off, in addition to the 1949 seasonal decline, 15.3 per cent in March, 17.6 per cent in April, 18.2 per cent in May, 26.7 per cent in June, 34.4 per cent in July, 51.7 per cent in August, 23.5 per cent in September. In October, November, and December it increased 11.3 per cent, 21.4 per cent and 40.7 per cent, respectively, over the corresponding period in 1949.

As early as the first part of July, 1950, possibly earlier, there had been discussed as possible remedies for the slack work of the drivers and helpers, either layoffs, or a further reduction of the drivers' mileage pay and the addition of that reduction to the helpers' mileage pay. The new trucks ordered by respondents in February were delivered in July. Respondents then made an agreement with the dealer that they might return the trucks. The arrangement was not carried out, however, and the trucks were kept. On the 17th of July, 1950, respondents' bank account was overdrawn $6,777.66. July 27, 1950, respondents secured a bank loan for $50,000 for operating capital, to be repaid at the rate of $3,000 per month. At the date of the hearing before the Examiner, six months later, the payments were current.

General discussion had taken place prior to July 30, 1950, concerning the low earnings of the drivers and helpers and possible layoffs. The evidence warranted no inference of antagonism on the part of respondents toward unions or about concerted activity on the part of their employees. The Trial Examiner so found. The Board agreed.

The foregoing facts, and possibly others, appear to have been the basis for the following statement of the Trial Examiner appearing in his report:

"These facts alone would be ample justification for a layoff of Respondents' transport employees during the low month of July 1950, barring other considerations." Those "other considerations" prompted the Trial Examiner's conclusion, adopted by the Board, that respondents did not in good faith lay off the complainants for financial and economic reasons, but, on the contrary, discharged them on account of their concerted objection to a proposed reduction in wages. We shall give careful attention to those considerations. But it is appropriate first to state the legal principles applicable to situations such as those upon which the present litigation arises.

■ The National Labor Relations Act gives to employees the right to be free from being restrained by their employers from engaging in concerted activity for their own benefit. The National Labor Relations Board is the forum for determining the fact as to whether that right has been violated. The findings of fact by the Board, if supported by substantial evidence on the record considered as a whole, shall be conclusive. 29 U.S.C.A. § 160(e). Even before the amendment of the Act, when it read: " * * * The findings of the Board as to the facts, if supported by evidence, shall be conclusive"—the Supreme Court directed that the evidence must be "substantial", more than a mere scintilla, such as a reasonable mind might accept as adequate to support a conclusion, must afford "a substantial basis of fact from which the fact in issue can be reasonably inferred", "must do more than create a suspicion of the existence of the fact to be established", and "must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; N.L.R.B. v. Columbian Co., 306 U.S. 292, 59 S.Ct. 501, 505, 83 L.Ed. 660.

The insertion of the word "substantial" in the Act by the amendment of 1947 did not, therefore, enlarge its meaning in that respect, but the insertion of the words "on the record considered as a whole" and the historical background of the Act and the amendment do have significance, at least under the present record. In construing the amended Act, the Supreme Court said in Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 487, 71 S.Ct. 456, 464, 95 L. Ed. 456:

"Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitively precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record."

■ The fact in issue is the intent, motive or reason in respondents' mind for the discharge of the complainants. When the mental process actuating a person in the performance of an act is the fact for determination, oftentimes circumstantial evidence is the only type available. Circumstantial evidence, as such, is not to be relegated to an undesirable category. But whether the facts and circumstances constituting such evidence be of such weight as to be substantial depends upon the nature of the facts shown, the consistency of those facts and circumstances with each other, their consistency with the truth of the ultimate fact, and their inconsistency with a reasonable inference of the truth of the converse of the fact sought to be shown.

when viewed in the light of the entire record. And these facts may not be viewed "in isolation." Universal Camera Corp. v. N.L.R.B., supra.

■■ The rule, as applied to cases of this nature, has been stated in Arnall Mills v. Smallwood, 5 Cir., 68 F.2d 57, 59, and N.L.R.B. v. Ray Smith Transport Co., 5 Cir., 193 F.2d 142, 146, as follows:

"Although the circumstances may support the inference of a fact, if it is shown by direct unimpeached, uncontradicted, and reasonable testimony which is consistent with the circumstances that the fact does not exist, no lawful finding can be made of its existence."

And in Ohio Associated Telephone Co. v. N.L.R.B., 6 Cir., 192 F.2d 664, 666:

"Granting that an inference may be drawn from the mere fact of participation followed by discharge that such participation was its cause, *the inference disappears when a reasonable explanation is presented that participation in the strike was not the cause of their discharge.*" (Italics ours.)

In American Smelting & R. Co. v. N.L.R.B., 8 Cir., 126 F.2d 680, 688, this court quoted and applied the rule as stated in N.L.R.B. v. Tex-O-Kan Flour Mills Co., 5 Cir., 122 F.2d 433, where the question was whether the employer had discharged or refused to re-employ because of union membership:

"In each case such membership may have been the cause, for the union was not welcomed by the persons having authority to discharge and employ. If no other reason is apparent, union membership may logically be inferred. Even though the discharger disavows it under oath, if he can assign no other credible motive or cause, he need not be believed. But it remains true that the discharger knows the real cause of discharge, it is a fact to which he may swear. If he says it was not union membership or activity, but something else which in fact existed as a ground, his oath cannot be disregarded because of suspicion that he may be lying. There must be impeachment of him, or substantial contradiction, or if circumstances raise doubts, they must be inconsistent with the positive sworn evidence on the exact point."

■ The "other considerations" relied upon by the Trial Examiner as destroying the positive proof of respondents that their motive and reason for discharging complainants were financial and economic are so embodied in the succeeding events that it is necessary to state them in some detail.

Thirteen of the fourteen drivers and helpers gathered at the garage Monday morning, July 31, 1950. It was customary for them to meet there, although usually they did not all gather in a group. Some of them knew and the remainder were told that it was planned that the drivers' wages were to be reduced to 2.5 cents per mile and the helpers increased to 2 cents per mile. None of the respondents were present, but the Examiner assumed that Robert Stafford, who was in and around the garage much of the time, knew of the meeting. It was agreed among the drivers at this meeting that they could not stand the reduction. Gill, one of the drivers, and a relative of the respondents, suggested that they go join the union. Gower and Pheiffer argued that they should find out definitely about the reported reduction first, and Gower suggested that Gill make the inquiry. Gill refused, whereupon Gower and Pheiffer went to look for Raymond or Robert Stafford. They found Raymond at respondents' office about a block from the garage. That was about 10:00 or 10:30 a. m. He was busy about his work at the office and the adjacent stockyards. The Examiner was justified in concluding that Gower and Pheiffer informed Stafford that the drivers and helpers, including Gower and Pheiffer, had concertedly discussed the reported reduction in the drivers' wages and that all had agreed that they could not stand the reduction. Gower and Pheiffer, as well as Stafford, testified that the proposal made by Gill to go join the union was not mentioned. Stafford swore he knew nothing about that until several days later. Stafford informed Gower and Pheiffer that there would be no such reduction in wages at that time. Stafford testified that he informed them that drastic layoffs

would have to be made. Gower testified that Stafford told them "something would have to be done" and that Robert Stafford told them "We'll have to figure out something." Pheiffer testified that Raymond Stafford told them that morning that they would try the same wages another week, but that there would have to be layoffs on account of lack of work. This testimony was not disputed, but the Examiner disregarded much of it as not "credible". Raymond Stafford discussed the situation with Respondents Robert and Alva Stafford early that afternoon, and Raymond was directed to do what he thought best. The other drivers and helpers waited 30 to 45 minutes that morning for Gower and Pheiffer to return and then left to go to the union office, where ten of them signed cards joining the union and authorizing it to act for them. (Another had theretofore signed.) They did not return to the garage until sometime about 4:00 p. m.

The morning's business at the stockyards produced two loads of livestock for transportation that day. When Raymond went to the garage to arrange for their movement, only Gower and Pheiffer were there. He assigned them to the two loads. As the other drivers and helpers returned in twos and threes later in the afternoon, he informed them that they would have to be laid off, as they were not needed. Raymond Stafford testified that the reason he laid off all the drivers and helpers other than the two sent out that day was because he did not know where to draw the dividing line between them, that some of the newer employees were better than some of the older, and also that he thought they could get along by using the garage employees as drivers. For the remainder of the week of July 31st, all of the truck operations were handled by using one of the partners and two of the garage men as drivers and hiring three new helpers. On Monday of the following week of August 7th, Shupe, one of the laid-off employees, asked for re-employment because he had a sick child, and was reinstated. Tuesday, August 8th, Raymond Stafford offered as many of the laid-off employees reinstatement as were needed, but they declined until the union had settled the dispute about their layoffs. They were then taking the position that they had been laid off because of their union affiliation.

As the Board adopted the Examiner's findings now under review, we look to those findings, incorporated in his report, for the basis for his inferences and conclusion. It appears from the report that the following facts are the basis for the inference of bad faith on the part of respondents: That respondents' business customarily increased after July and that therefore the reduction in personnel the last of July was not for financial reasons. That in February or March respondents ordered four new trucks which were delivered in July. That an arrangement was made in July to return them but that this arrangement was not carried out, indicating an expectation in July of increased business. That although respondents were overdrawn at their bank $6,777.66 on July 17, 1950, and had borrowed $50,000 on July 27, 1950, the fact that they were able to borrow this sum and had, up to the date of the hearing six months later, made their monthly payments on the note indicated that their credit was good and did not indicate a straitened financial condition caused by poor business conditions, but rather "indicated that Respondents were not concerned about their future business prospects." [4] That respondents' business did pick up in the last week in July and increased throughout August and the following months. That after the layoffs on July 31st, respondents were so short-handed that they had to use Robert Stafford as a driver twice that week, a garage man as a helper twice, and another garage man as a helper once, and had to employ three new helpers for one trip each that week, from which the inference is drawn that the laid-off employees were known to have been needed for the future on July 31, 1950. As none, other than the one, were recalled until the following week, when it is assumed respondents must have known a day or two in advance how many would be needed, it is inferred that they

---

4. From the Examiner's report.

were discharged for punitive reasons. That the "admission" of Raymond Stafford that he felt on July 31st that respondents could "get by" on very few drivers by using the garage men as dual-purpose men, to drive when they were not busy in the garage, indicated that at the time of the layoff he was contemplating the use of other personnel to carry on the transportation of the livestock rather than to recall any of the experienced laid-off drivers. That the fact that the layoffs were made shortly after the group meeting at the garage Monday morning indicated that this concerted action was the reason for the layoffs. That Gill was No. 1 on the assignment board Monday, July 31st, but was laid off instead of being permitted to take out the second load that day. That layoffs were not usual in slack reasons. That there was no serious idea of layoffs prior to the meeting of the employees Monday morning, because Raymond Stafford testified that the decision for the layoff was made Monday afternoon. That the layoff of all the drivers and helpers who participated in the meeting, except Gower and Pheiffer, indicated that union affiliation and concerted activity were the cause of the layoffs. That men senior to Gower and Pheiffer (who ranked second and fifth) were laid off, indicating that the former were laid off because they went to the union office. That since drivers and helpers were paid on a mileage basis and did not work except when there were trips for them to make, their layoff for economic reasons was a blind and a subterfuge.

These facts and circumstances, constituting the circumstantial evidence relied upon by the Examiner, do not measure up to the standard of substantial evidence. Many are not inconsistent with the converse of the ultimate fact sought to be shown, and inferences sought to be drawn from others are inconsistent with other established facts shown by the record, as we shall point out.

The inference that the state of respondents' business on July 31, 1950, was such as to belie the fact that the layoffs were for financial reasons is inconsistent with the established facts. Although respondents'

business was seasonal and increased substantially in January and February, 1950, (when the new trucks were ordered) over what it had been during those months in 1949, thereafter and before the trucks were delivered, the business fell far below that for the corresponding periods in 1949 and was 34.1 per cent under it in July and 51.7 per cent in August, 1950. Substantial bank overdrafts, large loans for operating capital, coupled with substantial loss of business, without explanation do not warrant an inference of unconcern of financial affairs or intent to expand operating equipment. Although the business did pick up some in July and again in August, it was still far below what it was in those months of 1949.

It is inferred that because one of the partners and garage men were used as drivers and helpers after July 31, 1950, it was known at the time of the layoffs July 31st that the men laid off were needed. The garage men were on straight pay. They had in the past been used on the trucks. To contemplate using them in the dual capacity of garage men and drivers or helpers, and the partners, if necessary, was entirely consistent with retrenchment and lack of need for the laid-off drivers, at least on an experimental basis. Helpers were ordinarily selected by the drivers. The fact that three helpers not employed prior to July 31st were used by the partner and garage men drivers was consistent with the former practice of drivers selecting their own helpers. Then, too, the following week after July 31st, reinstatements were made and when offers of reinstatement were made to as many of the other men as were needed who had been laid off, they declined to return to their previous regular work.

The so-called "admission" of Raymond Stafford that he felt on July 31st that they could "get by on very few drivers by using the garage men as dual purpose men * * *" is entirely consistent with retrenchment.

The fact that the layoffs were made shortly after the meeting at which complaint was voiced concerning the proposed readjustment of wages, standing alone, could give rise to the inference that the

layoffs were on that account. But the record shows that layoffs had been discussed for some time because of the thinness with which the available work had been spread among the employees. And the problem of increasing the wages of the helpers, only recently ordered by the Interstate Commerce Commission during a period of declining business, existed long prior to July 31st. In fact, a few of the drivers, recognizing the inadequacy of their helpers' mileage pay, had voluntarily transferred part of their drivers' pay to their helpers. As one of respondents expressed it, "something had to be done." And that was apparent before the "concerted activity", consisting of the meeting in the garage on the morning of July 31st. And the two employees who presented the objection of all to the proposed wage cut, and who told their employers that they could not stand the proposed reduction, were not laid off because of their complaint. When the record is viewed as a whole and all of the established facts are considered, the Examiner's inference dwindles to a bare suspicion.

The fact that Gill, who was No. 1 on the assignment board July 31st, was not assigned to the load that went out at 2 o'clock, or that he or others older in seniority were not given the load that went out later that afternoon, is explained by the fact that those two loads were given to the only two men who were there when arrangements had to be made to send them out. That fact also furnishes a reasonable reason for retaining Gower and Pheiffer, who had already been assigned trips that day.

The fact that the drivers and helpers were paid strictly on a mileage basis made the number of those employees of less financial importance to respondents than it would have been had they been paid on a straight time basis. But the reason for reducing their number is not unexplained when the fact that their welfare and an increase in the amount of earnings of the individual employees had been a matter of concern on the part of respondents and a subject of discussion and concern of the employees for a considerable length of time.

Upon the record we are forced to the conclusion that there was no substantial evidence to support the finding that the layoffs were discriminatory or because of concerted activity on the part of those laid off. That being the case, the union did not represent respondents' employees after July 31, 1950, and there was no violation of the Act in respondents' failure to treat the union as the representative of the employees.

The petition for the enforcement of the Board's order must be and is denied.