**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**DES MOINES FOODS, INC., Respondent.**

**No. 16694.**

United States Court of Appeals
Eighth Circuit.

Nov. 29, 1961.

Leo N. McGuire, Atty., National Labor Relations Board, Washington, D. C. made argument for petitioner. Stuart Rothman, Gen. Counsel, Washington, D. C., Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Samuel M. Singer, Atty., and Leo N. McGuire, Atty., NLRB, Washington, D. C. were on the brief.

Hobart E. Newton, Stuart, Iowa, made argument for respondent, and was on the brief.

Before SANBORN, MATTHES and RIDGE, Circuit Judges.

SANBORN, Circuit Judge.

The National Labor Relations Board, in an unfair labor practice proceeding under § 10 of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160, based on charges by Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO, a labor union, determined that the respondent, Des Moines Foods, Inc., of Des Moines, Iowa,

> "[b]y discharging, laying off, transferring to less desirable work and refusing to recall employees, because of their union activities, * * has engaged in and is engaging in unfair labor practices within the meaning of Section 8(a) (3) of the Act";

and

> "[b]y the above conduct and by interrogation of employees, threats of discharge and other economic reprisal, and giving the impression of surveillance of union meetings, thereby interfering with, restraining and coercing employees in the exercise of rights guaranteed by Section 7 of the Act, * * * has engaged in and is engaging in unfair labor practices within the meaning of [Section] 8(a) (1) of the Act."

The Board also found that the respondent had discriminatorily discharged Ellen Hay, one of its employees, because of her union activities, and had similarly, and for like reasons, transferred Edith Brower, another employee, from the position she had occupied in respondent's plant to a less desirable position, and had in other respects discriminated against her. The Board issued its order requiring the respondent to cease and desist from the unfair labor practices which the Board found the respondent had committed; to reinstate Ellen Hay to her former position; to make her and Edith Brower whole for any loss of pay they may have suffered because of discrimination; and to post the usual notices.

The Board has petitioned this Court for the enforcement of its order, pursuant to § 10(e) of the Act, as amended, 29 U.S.C.A. § 160(e), which, among other things, provides: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." The respondent resists the enforcement of the order, asserting that the evidentiary basis for it is inadequate. The question for decision is whether the Board's determination and order (reported in 129 N.L.R.B. No. 160) are supported by substantial evidence on the record as a whole.

The evidentiary facts out of which the controversy arose may be stated briefly as follows: The respondent operated an egg processing plant, where eggs were converted into frozen yolks, frozen whites, and frozen whole eggs. The processed eggs were sold and shipped to points outside the state of Iowa. Howard Randolph was the President of the respondent. Donald D. Brown was plant manager. Mrs. Jacqueline (Jacky) Flinn was floorlady. When the plant was in full operation it employed in the neighborhood of one hundred persons, nearly all of whom were women. Some ninety women were engaged in breaking eggs and separating the whites from the yolks. They worked on three conveyor lines, with thirty women on each. They were under the direction of the floorlady, Mrs. Flinn. The quota of each was 40 buckets of whites in eight hours. Late in 1958 the Union began a campaign to organize the employees of respondent. Ellen Hay and Edith Brower were active in the campaign, signed Union cards, attended Union meetings, and solicited fellow employees to join the Union. The Union won a consent election held on March 5, 1959, and on March 12, 1959, was certified as the bargaining agent for respondent's employees. During the organizational campaign, Mrs. Flinn interrogated employees about the Union and made anti-union statements which, if attributable to the management of the respond-

ent, clearly constituted an unfair labor practice under § 8(a) (1) of the Act. The respondent contends that Mrs. Flinn was not a supervisor within the definition of 29 U.S.C.A. § 152(11),[1] and that her conduct and statements may not, under the evidence, be attributed to management.

The problem of when and under what circumstances one in the position of Mrs. Flinn—who had no authority to hire or to fire—reasonably may be determined to express the attitude of management rather than her own personal sentiments relative to unionization, has been a troublesome one. In 1939 it was considered by this Court in Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 106 F.2d 100, 114–116. See, also, Ballston-Stillwater Knitting Co., Inc. v. National Labor Relations Board, 2 Cir., 98 F.2d 758, 762. In those cases it was held that certain supervisory employees were not shown to have had authority to act or to speak for management. In 1940, the Supreme Court, in International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50, ruled that an employer might be held responsible for the acts of "so-called agents", although not "attributable to him on strict application of the rules of *respondeat superior*." In that case, "the so-called agents" were said to be not even foremen. Of them, the Court said (311 U.S. p. 80, 61 S.Ct. p. 89):

> "* * * To be sure, they were not high in the factory hierarchy and apparently did not have the power to hire or to fire. But they did exercise general authority over the employees and were in a strategic position to translate to their subordinates the policies and desires of the management."

In National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 599, 61 S.Ct. 358, 366, 85 L.Ed. 368, the Court said:

> "* * * Nor does the Board lack the power to give weight to the activities of some of the supervisory employees on behalf of Independent [union], even though they did not have the power to hire or to fire. As we indicated in International Association of Machinists v. National Labor Relations Board, supra [311 U.S. 72, 61 S.Ct. 721, 85 L.Ed. 50], the strict rules of *respondeat superior* are not applicable to such a situation. If the words or deeds of the supervisory employees, taken in their setting, were reasonably likely to have restrained the employees' choice and if the employer may fairly be said to have been responsible for them, they are a proper basis for the conclusion that the employer did interfere. * * *"

See, also: National Labor Relations Board v. Montgomery Ward & Co., 9 Cir., 133 F.2d 676, 682; National Labor Relations Board v. Winona Knitting Mills, Inc., 8 Cir., 163 F.2d 156, 160–161; National Labor Relations Board v. Solo Cup Company, 8 Cir., 237 F.2d 521, 523–524.

We think that in the instant case the Board reached a permissible conclusion in determining that, under the evidence, the conduct of Mrs. Flinn in interrogating employees and making statements predicting the loss of jobs if the Union won the election, reflected the attitude of management. Randolph and Brown knew about the union activities in the plant. At or about the time the Union commenced its campaign, Randolph had instructed Brown not to discuss the Union with any of the plant employees and to have nothing to do with the Union campaign. Brown had also been instructed

1. "(11) The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

by Randolph not to fire or demote any employee without consulting him. Brown testified that he observed these instructions and did not "talk union or nonunion" to the employees. There was no showing that Randolph or Brown—who reasonably may be believed to have kept in touch with all that was going on in the plant during the Union campaign—instructed Mrs. Flinn not to concern herself with the activities of the Union or to refrain from discussing the Union with the employees for whom she was the supervisor. Her connection with management and her duties as floorlady were such that we think the Board might permissibly infer, as it did, that her antiunion conduct reflected the attitude of management.

The discharge of Ellen Hay and the treatment of Edith Brower, found by the trial examiner and the Board to have been discriminatory, require no detailed discussion. Each of them had been a strong advocate and adherent of the Union. Randolph had known Mrs. Hay for many years, and had previously employed her at the Randolph Food Company at Guthrie Center, Iowa, where both resided. She had been an employee of the respondent from the spring of 1955 until she was discharged by Randolph on March 19, 1959, which was seven days after the Union had been certified, and some fourteen days after the election was won by the Union. The respondent's evidence was that her sudden discharge resulted because of misconduct which consisted in calling Mrs. Flinn, the floorlady, some sort of a liar. It seems that when Randolph, who was away from the plant on a sales trip from March 7 to about March 15, 1959, returned, he was informed by Brown that Mrs. Hay had said that Mrs. Flinn was "a damn dirty black liar." Randolph testified that he called Mrs. Hay to his office on March 19; that she admitted having made some such remark about Mrs. Flinn; and that he told her that she was discharged and that "no one in our employ was going to treat our floorlady that way and get by with it." Mrs. Hay denied that she admitted to Randolph that she made the remark attributed to her by Brown. Her version of what she said about Mrs. Flinn and the provocation for saying it is shown by the following excerpts from her testimony:

> "A. [Ellen Hay, in answer to question by Mr. Frisch, counsel for General Counsel, N.L.R.B.] This particular day [March 12], it was just a while before noon, we started filling this large vat of eggs. We had our noon hour early—we usually went back to work at 1:00, but that day we went back at 12:00, or 12:30—12:30 I think it was—we were breaking along, and we thought things were going all right. There was a lot of bloody eggs, and at recess time Jacky came in the lunch room, and accused us, or said we were laying down on the job, and we were not working, and she said that tank is to be filled before you go home tonight and at the rate you're going it will take until 6:00 o'clock or later, and nobody leaves until it is full, and the recess time was at about 3:00, and she says at that time, it is only half full, so we went back in to work, and worked just the same as usual.
>
> * * * * * *
>
> "And so then when 4:00 o'clock come, why, they hollered it is all done, we have filled the rest of the tank in 45 minutes. So——
>
> "Q. Who hollered that? A. I think—I wouldn't say for sure, but I think Don came to the door and said that is all.
>
> "Q. Don Brown? A. Yes.
>
> "Trial Examiner: This is at 4:00?
>
> "The Witness: Yes, 4:00 o'clock, and from that time on we started to the kitchen with our trays, and you couldn't hear yourself think. Everybody was talking, cursing——
>
> "Q. What time did your pay end? A. 4:30.

"Q. How long did you get paid for that day? A. We get paid until 4:00 o'clock.

"Q. Was it the normal quitting time; 4:30? You lost a half hours pay? A. Yes.

"Q. Everybody did? A. Yes, sir, and that was why everybody was mad.

* * * * * *

"A. I heard a lot of people complaining.

"The Witness: I went to the—directly to the lunchroom and got out our coats, and everybody was talking, and complaining which was what I did too, and I made the remark—there was a couple of other ladies at the end of the lunchroom talking about the way I felt—and I made the remark, 'Boy, it sure takes guts to get up and tell a barefaced lie like that, and if I couldn't handle women better than that, I would throw in the towel.'

"Trial Examiner: It takes guts to tell—where did you say this?

"The Witness: In the lunchroom.

"Q. Was any supervisor present in the lunchroom when you said that? A. No."

Mrs. Hay testified that the next work day after this occurrence, Brown—who had evidently been told about her remark relative to Mrs. Flinn—questioned Mrs. Hay with respect to it and said that Mrs. Flinn had an apology coming; that Mrs. Hay promised to apologize and did so that same day; that Mrs. Flinn said she did not know what Mrs. Hay had said, and hoped that she did not think that she (Mrs. Flinn) had anything to do with the matter. Mrs. Hay also testified that she was not the only person who made similar angry remarks about Mrs. Flinn over the loss of the half hour of working time; that she so advised Randolph at the time she was called to his office; and that Randolph showed a lack of interest in obtaining the names of other offenders. There was additional evidence that on March 12, at 4:00 o'clock, all the women who had lost the one-half hour of pay were "mad girls" and that things were said generally by them on that occasion that would not bear repeating. The record indicates that no employee except Mrs. Hay was discharged for misconduct.

It would seem safe to say that any employer who, during an organizational campaign or before the heat of such a campaign had been dissipated, discharges a competent employee, with a record of long service, who has been a strong supporter of the union, renders himself vulnerable to a charge of having done so because of the employee's union activities.

We think that the most that can be claimed by the respondent is that the evidence is consistent with the hypothesis that Mrs. Hay was discharged because of her activities on behalf of the Union and with the hypothesis that she was discharged for misconduct. The Supreme Court, in National Labor Relations Board v. Nevada Consolidated Copper Corp., 316 U.S. 105, 106, 62 S.Ct. 960, 961, 86 L.Ed. 1305, has said: "The possibility of drawing either of two inconsistent inferences from the evidence did not prevent the Board from drawing one of them, as the court below seems to have thought." And we note the following statement in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456:

> "* * * To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the

Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*. * * * "

See, also, National Labor Relations Board v. Marcus Trucking Co., Inc., 2 Cir., 286 F.2d 583, 592.

The question whether Edith Brower was discriminated against with respect to her job assignment and lay-off treatment because of what she had done in support of the Union, was, we think, also a question of fact for the Board, and not a question of law for this Court. Obviously, we may not concern ourselves with alleged errors of fact.

The petition of the Board for enforcement of its order is granted.