NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

GLOBE PRODUCTS CORPORATION,
Respondent.

No. 8921.

United States Court of Appeals
Fourth Circuit.

Argued June 6, 1963.

Decided Sept. 16, 1963.

Elliott Moore, Atty., N. L. R. B. (Stuart Rothman, Gen. Counsel, Dominick Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, on brief), for petitioner.

Jacob Blum, Baltimore, Md. (Charles Yumkas, Baltimore, Md., on brief), for respondent.

Before SOBELOFF, Chief Judge, and BRYAN and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Chief Judge.

The National Labor Relations Board, pursuant to 29 U.S.C.A. § 160(e), seeks enforcement of its order directing the employer-respondent to reinstate two discharged employees with back pay and interest. 139 N.L.R.B. No. 126.

Globe Products Corporation manufactures venetian blinds for interstate commerce. Both employees in question, Amelia Heck and Ruth Moran, worked in Globe's headrail department as machine operators and on the conveyor line assembling headrails for venetian blinds. Heck had worked for the company for six years before leaving in 1957 to take another job; she had returned to work for the company in September, 1961. Moran came to work in August, 1961. Both were discharged April 19, 1962. They allege that they were discharged because of their union activities, while the employer claims that their poor attitude and ineffective production records were the sole reasons for their dismissal. After a full hearing the Board determined that the discharges were motivated by anti-union considerations in violation of section 8(a) (1) and (3) of the National Labor Relations Act (29 U.S.C.A. § 158(a) (1) and (3)).

Organizers from the United Furniture Workers of America visited Heck's home on April 17, 1962, and informed her that they were organizing the company. As a result of the visit Heck signed a union card and was given four or five blank cards for the purpose of obtaining signatures of other employees. The next day, at a restaurant off the employer's premises, Heck succeeded in obtaining signatures on all of the cards. Among those who signed was Ruth Moran.

The following afternoon, April 19, 1962, Heck and Moran were summoned to the office of the Production Manager, Philip Katz, and told that they were dismissed. According to Heck's testimony, Katz

"was sitting there with both our checks in his hand, and he looked up at us and he said, 'I am afraid I am going to have to let you two go, because we don't like the idea of our employees fooling around with the union.' He said, 'We are going to make examples of you and Ruth [Moran].' And then he hesitated and said, 'Besides, we have got reports that your production is slow and you have been fooling around on the table.' "

Heck testified she was told by Katz that the working leader in the headrail department, William Gilliam, had informed him of the employees' poor production and attitude, but that when she asked to have Gilliam brought to the office Katz refused. Moran corroborated Heck's testimony.

In his testimony, Katz categorically denied any mention of union activity. He stated that he constantly inquired about production in the headrail department and was informed by Gilliam that Moran and Heck were the cause of trouble. He admitted that he spoke to Moran only twice, once two months after she was hired and again six months later, and that he never spoke to Heck. He also admitted that Heck was a good machine operator. Katz asserted that one of the reasons for dismissing her was a statement she had made to Evelyn Heuer, a machine operator, while Heck was working on the conveyor line, to the effect that Heuer should slow down production. Heck testified that she made the request because "[t]here were times I was working behind the conveyor when I didn't have any rods to put in the blinds, and we had to stand and wait for the rods." Heuer admitted on cross-examination, in contradiction to her direct testimony, that she never informed Gilliam of the episode and that before Heck came to work another employee often had occasion to tell her to slow down. Katz admitted that he never questioned Heck about her alleged request for a slowdown.

Katz further testified that at his direction Gilliam spoke to Heck and Moran the day before their discharge and that "Mr. Gilliam told me when he spoke to them they told him that if I wanted the produc-

696

tion picked up that he should tell me to fire them." Katz, however, admitted that he made no mention of this alleged statement to the girls when he discharged them and the signed statement made by Gilliam to the Labor Board representative discloses no such accusation.

The plant manager, Samuel Fradin, testified that two weeks before Ruth Moran's discharge, he told her that her production was poor and that unless it improved she would have to be released. Moran promised to work hard. Fradin admitted that Heck was a good machine operator but claimed that both discharged employees were "always horsing around" on the conveyor table.

There was evidence that Moran, as a machine operator, suffered by comparison with another employee; however, it appears that Moran was far less experienced and was assigned an inferior machine. While Fradin testified that after the discharges production increased, the Board found from an examination of company records that the average daily production rate actually decreased in the four days following the discharge as compared to the two prior weeks. No records for other days were available, and apparently only group production records, not individual records, were introduced.

Other employees in their testimony charged that different members of management had made statements to them in regard to unions. One testified that Fradin told her that he had quite a few complaints about her wanting people to join the union and warned that if such complaints continued he would have to do something about it. Another testified that the production supervisor, Andrew Brockey, had told her that if the union ever got in the plant the company would move to a different location. Fradin specifically denied making the statement attributed to him, and Brockey, while admitting that he did speak to the employee about union activity, claimed that he only answered specific questions propounded to him and never made the alleged statement.

■ This court's task is to determine whether, based on the whole record, the finding of the Board is supported by substantial evidence. Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The inquiry is whether "on the record of the evidence the agency could reasonably make the finding." 4 Davis, Administrative Law Treatise 118, § 29.01 (1958). That this court, faced with the same facts, might have made a different determination is immaterial. Universal Camera Corporation v. N. L. R. B., supra; N. L. R. B. v. Walton Mfg. Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962); N. L. R. B. v. Nevada Consolidated Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305 (1942).

■ The evidence here is conflicting; indeed there appears to be sufficient evidence to support either side. If Katz said what Heck and Moran attribute to him, his statement was an outright confession of unlawful discrimination eliminating "any question concerning the intrinsic merits as to each of the individual discharges, the precise evidence showing management's knowledge that any or all were engaged in the union activity, or other causes suggested as the basis for the discharge." N. L. R. B. v. Ferguson, 257 F.2d 88, 92 (5th Cir., 1958). A careful appraisal of the evidence convinces us that the Board's findings are in fact supported by substantial evidence.

■ The employer also contends that the Board exceeded its power in awarding interest in conjunction with the back pay. The statute, 29 U.S.C.A. § 160(c), empowers the Board "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter * * *." It is entirely silent on the subject of interest. This, however, is not determinative, as Justice Frankfurter, considering a similar problem, stated:

"There is an area plainly covered by the language of the Act and an area no less plainly without it. But

in the nature of things Congress could not catalogue all the devices and stratagems for circumventing the policies of the Act. Nor could it define the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations. Congress met these difficulties by leaving the adaptation of means to end the empiric process of administration. The exercise of the process was committed to the Board, subject to limited judicial review." Phelps Dodge Corporation v. N. L. R. B., 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941).

The power conferred upon the Board was made purposely broad. Though for 26 years the Board followed a policy of denying interest in reinstatement and back pay cases, it did not lose its power to allow interest by merely permitting it to lie dormant. United States v. Morton Salt Co., 338 U.S. 632, 647–648, 90 S.Ct. 357, 94 L.Ed. 401 (1950). Indeed this is the teaching of N. L. R. B. v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953), where the Supreme Court approved a substantial change in the Board's long pre-existing method of computing back pay.

It is true that the Board in issuing a back pay order is enforcing a public rather than a private right; but by making the individual whole for losses suffered from illegal discrimination, the public right is thereby vindicated. Phelps Dodge Corp. v. N. L. R. B., supra, 313 U.S. 195–197, 61 S.Ct. 852–854, 85 L.Ed. 1271. In fashioning its decrees to correct violations of the Act, the Board with its experience and expertise should be permitted discretion. An order "should stand unless it can be shown that [it] is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric & Power Co. v. N. L. R. B., 319 U.S. 533, 540, 63 S.Ct. 1214, 1218–1219, 87 L.Ed. 1568 (1943).

Underlying the long-accepted practice of awarding interest in debtor-creditor cases is the principle that to do so fully compensates the creditor for the loss of the use of his money. Under the Act, an award of back pay is treated as a debt, Nathanson v. N. L. R. B., 344 U.S. 25, 27–28, 73 S.Ct. 80, 97 L.Ed. 23 (1952), and where there has been delay it does not appear arbitrary for the Board to include interest. Such an allowance, which merely makes the employee whole, is in no sense punitive as against the employer.

■ There is no merit in the contention that Congress, by amending the statute in other respects while the Board was operating under its old policy, intended to freeze that policy into law, forbidding any other practice. Something more than congressional inaction is ordinarily required to warrant such an inference. The contention disregards the fact that Congress had deliberately left the Board with broad discretion to fashion remedies under the Act. Phelps Dodge Corp. v. N. L. R. B., supra. Next, it ignores the teaching of N. L. R. B. v. Seven-Up Bottling Co., supra, in which the Supreme Court approved a substantial change in the Board's method of computing back pay against the employer's argument that Congress having amended the statute the Board was precluded from subsequently changing the formula. And finally, it fails to take into account the strong probability that when Congress amended the Act it never even remotely considered the problem this case presents.

For the above reasons, and in accordance with the decisions on this point by two of our sister circuits, we sustain the award of interest as within the power of the Board. International Brotherhood of Operative Potters, A.F.L.-C.I.O. v. N. L. R. B., 320 F.2d 757 (D.C.Cir., 1963); Reserve Supply Corp. of L. I. v. N. L. R. B., 317 F.2d 785 (2d Cir., 1963).

The petition for enforcement is granted.