**MARSHFIELD STEEL COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 17315.**

United States Court of Appeals Eighth Circuit.

Nov. 20, 1963.

Ransom A. Ellis, Jr., of Walker, Daniel, Clampett, Rittershouse & Ellis, Spring-field, Mo., made argument for the petitioner and filed brief.

Leo N. McGuire, Atty., N. L. R. B., Washington, D. C., made argument for the respondent and Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Warren M. Davison, Atty., N. L. R. B., Washington, D. C., were with him on the brief.

Before VOGEL and MATTHES, Circuit Judges, and ROBINSON, District Judge.

VOGEL, Circuit Judge.

Marshfield Steel Company, a corporation, petitions this court to review and set aside an order of the National Labor Relations Board issued February 1, 1963, reported at 140 N.L.R.B. No. 99, wherein the Board found petitioner guilty of violating §§ 8(a) (1) and 8(a) (3) of the National Labor Relations Act as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq. The Board, in its answer to the petition, has requested enforcement of its order. This court has jurisdiction under the provisions of 29 U.S.C.A. § 160.

Petitioner is engaged in the manufacture of tandem suspensions for highway semi-trailers in Marshfield, Missouri, and was formed as a separate corporation in early 1960. Prior thereto petitioner had operated as Hutchens & Sons Metal Products in Springfield, Missouri. Petitioner commenced its operations at Marshfield in May 1960. By January 1962 it employed about 60 men there. At the same time, petitioner still employed approximately 150 workers at its operation in Springfield, Missouri, which operation was eventually "faded out" and transferred to Marshfield. The Springfield operation had a union contract with the Allied Industrial Workers.

The record indicates that union activity in the form of an organizational campaign at petitioner's Marshfield plant first began early in 1962. Employees Roger Murphy and Fred Williams obtained authorization cards from the union (United Steel Workers of America) and

during the first several months of 1962 signed up approximately 30 of petitioner's employees. A representation election was scheduled for June 8, 1962, but was cancelled prior thereto.

On June 15, 1962, a complaint was filed on behalf of the union. The complaint charged that petitioner: (1) On May 1, 1962, discharged employees Fred Williams, Myrl Page, Edward Towers and Roger Murphy for engaging in activities on behalf of the union in violation of § 8 (a) (3); and (2) threatened employees that if the union won the election the plant would be moved or closed; threatened to discharge employees if union activities resumed; interrogated employees concerning their membership in and activities on behalf of the union; suggested to employees that they withdraw from membership in or support of the union; and engaged in surveillance or created the impression of surveillance of its employees' union activities, all in violation of § 8(a) (1).

Following a hearing, the Trial Examiner issued his Intermediate Report, finding that the petitioner had engaged in and was engaging in certain unfair labor practices and recommending that it cease and desist therefrom and that it take certain affirmative action, including offering reinstatement to employees Murphy, Williams, Page and Towers, together with any loss of earnings they had suffered by reason of their discharge, plus 6% interest thereon, with the usual notices and postings. Other charges contained in the complaint were dismissed. The Board adopted the Intermediate Report and Recommended Order of the Trial Examiner.

Petitioner urges this court to hold that the Board's order is not supported by substantial evidence. Particularly as to the discriminatorily discharged employees Williams, Page and Towers, it claims that they were discharged for repeated violation of a well known, existing plant rule against leaving machines before quitting time and they had been previously warned that further violations would result in discharge; and that

Murphy was discharged because of excessive absenteeism and loafing in the rest room and his discharge occurred only after supervisors had thoroughly checked his record. Petitioner further contends that the Board exceeded its authority under § 10(c) of the Act, 29 U.S.C.A. § 160(c), by awarding interest on back pay to the discharged employees and also that that portion of the order of the Board which requires petitioner to cease and desist its alleged unfair labor practices as to "any other labor organization" is so broad as to be unenforceable.

■ As is true in most of these cases, the testimony is conflicting and contradictory. Nevertheless, it is well established that this court may not overrule findings of the Board where they are supported by substantial evidence on the record considered as a whole. N. L. R. B. v. Morrison Cafeteria Co. of Little Rock, Inc., 8 Cir., 1963, 311 F.2d 534, 538; N. L. R. B. v. Des Moines Foods, Inc., 8 Cir., 1961, 296 F.2d 285, 286.

■ An examination of the entire record indicates quite clearly that substantial evidence does support the Board's findings and order. As to the § 8(a) (1) violations, Murphy and Williams testified that company supervisor Gayle Price told them that " * * * if a union came in [to] the plant [President Hutchens] told him he would move [the plant] back to Springfield." Such testimony was corroborated by Wayne King, the union representative. Testimony of employee Thomas was that the petitioner's manager McDonald told him, "Yes, if the plant went union, that it would be closed down." Employee Alvis L. Rost corroborated this by stating that McDonald told him that if a union got in they could lock the doors of the building. There is testimony in the record that, in response to an inquiry from employee Miles as to whether any more employees would be discharged, petitioner's foreman McKinney stated, "No, not until the union started raising another stink,"; "That is why the last guys were fired." Miles additionally testified that Max Estes, one of petitioner's supervisors, stated that,

"[T]he company would move if the union won * * *." As to the finding of interrogation of employees, the evidence indicated that manager McDonald inquired of employees Thomas and Rost whether they "knew anyone that had signed a union card".

Threats, such as to move the plant back to Springfield or close it if the union won, and coercive interrogation of employees in the course of an organizational campaign constitute interference and restraint within the scope of § 8(a) (1). N. L. R. B. v. Morrison Cafeteria Co. of Little Rock, Inc., supra; N. L. R. B. v. Griggs Equipment Co., Inc., 5 Cir., 1962, 307 F.2d 275; N. L. R. B. v. Bendix Corporation (Research Laboratory Division), 6 Cir., 1962, 299 F.2d 308, certiorari denied, 371 U.S. 827, 83 S.Ct. 47, 9 L.Ed.2d 65; N. L. R. B. v. Solo Cup Co., 8 Cir., 1956, 237 F.2d 521.

The record considered as a whole also contains substantial support for the Board's finding that petitioner was in violation of § 8(a) (3) of the Act in that employees Murphy, Williams, Towers and Page were discriminatorily discharged because of their activity in behalf of the union, and that such was done for the purpose of discouraging membership in the union. Petitioner does not dispute the Board's finding that each of the discharged employees in question was engaged in union activities. It contends, however, that it had no knowledge of these activities and, thus, that the Board was incorrect in finding that the employees were discriminatorily discharged. Petitioner's assertion as to the law is correct. Osceola Co. Coop. Cream Ass'n v. N. L. R. B., 8 Cir., 1958, 251 F.2d 62, 67; N. L. R. B. v. Stafford, 8 Cir., 1953, 206 F.2d 19. Petitioner's argument is particularly unpersuasive here, however, since its manager McDonald himself testified that he knew of the union's attempt to organize the plant about the middle of March 1962. The record further contains substantial testimony that on April 30, 1962, the day before the discharges, McDonald stated to employee Henry Thomas that he "knew

who is running" the union; that he knew "who is handing out those cards"; and that he "was going to clean out a nest". McDonald told Thomas that if he, Thomas, "testified [to] this before the Board, of course, he [McDonald] would have to deny it". Later that day he told employee Thomas that he had his [Thomas'] name on the list to be fired the next morning but, apparently because Thomas at that time confessed that prior thereto he had lied to McDonald when he denied signing a union card, McDonald said Thomas would not be discharged and that he "could go tell [his union friends] that they would not be needing to expect too many more checks from Marshfield Steel". The next day Williams, Page, Towers and Murphy were discharged.

■ The statements referred to above were in the main denied by witnesses for the petitioner. However, the credibility of the witnesses, the determination of which of contradictory statements were to be believed and the weight to be given the testimony were matters for determination by the Board. § 10 (e) of the Act as amended, 29 U.S.C.A. § 160(e) specifically provides, among other things:

> "* * * The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."

This court, in N. L. R. B. v. Morrison Cafeteria Co. of Little Rock, Inc., 8 Cir., 1963, 311 F.2d 534, 538, said:

> "* * * The rule in this Circuit is that 'the question of credibility of witnesses and the weight to be given their testimony' in labor cases is primarily one for determination by the trier of facts. Paramount Cap Mfg. Co. v. N. L. R. B., 260 F.2d 109 (8 Cir. 1958); Kitty Clover, Inc. v. N. L. R. B., 208 F.2d 212, 214 (8 Cir. 1953). See, also, N. L. R. B. v. Walton Mfg. Co., 369 U.S. 404, 407–408, 82 S.Ct. 853, 7 L.Ed.2d 829 (1961). This Court is not the place where that question

can be resolved, unless it is shocking to our conscience. It is not so here."

There is in the record here testimony from which the conclusion could be drawn that there existed justifiable cause for the discharge of the employees concerned. The existence of such cause, however, would not *ipso facto* relieve petitioner of the Board's findings that the discharges were discriminatory. We said in N. L. R. B. v. Solo Cup Co., 8 Cir., 1956, 237 F.2d 521, 525:

> " * * * A justifiable ground for dismissal is no defense if it is a pretext and not the moving cause."

In N. L. R. B. v. Whitin Machine Works, 1 Cir., 1953, 204 F.2d 883, 885, a similar proposition was stated thusly:

> " * * * Although the discharge of an inefficient or insubordinate union member or organizer is lawful, it may become discriminatory if other circumstances reasonably indicate that the union activity weighed more heavily in the decision to fire him than did dissatisfaction with his performance."

The Board apparently believed that union activity on the part of Murphy, Williams, Towers and Page weighed more heavily in the decision of the petitioner to fire them than did its dissatisfaction with their performance. Such finding by the Board was supported by substantial evidence on the record as a whole and accordingly may not be disturbed on appeal.

Petitioner's next contention is that the Board exceeded its authority under § 10(c) of the Act[1] by awarding interest on the back pay ordered to be paid to the discharged employees. In Isis Plumbing & Heating Co., 1962, 138 N. L. R. B. 716, (Board members Rogers and Leedom dissenting) the Board for the first time instituted the requirement of interest on back pay awards. Thus far the Isis holding as to interest has been approved by three of the Courts of Appeals. Reserve Supply Corp. of L. I., Inc. v. N. L. R. B., 2 Cir., 1963, 317 F.2d 785; International Brotherhood of Operative Potters v. N. L. R. B., D.C.Cir., 1963, 320 F.2d 757; N. L. R. B. v. Globe Products Corp., 4 Cir., 1963, 322 F.2d 694. In N. L. R. B. v. Adams Dairy, 8 Cir., 1963, 322 F.2d 553, this court awarded interest in connection with payment to employees under a contract.

Petitioner argues that for some 26 years prior to Isis the Board did not grant interest on back pay and that during that long period of time Congress reviewed and revised the Act on several occasions. It argues that if the Act is to be changed to permit the award of interest, it should be done by Congressional action and not by the Board. In Rodgers v. United States, 1947, 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3, reversing 158 F.2d 835 on other grounds, the Supreme Court rejected a similar argument. There the court was dealing with *penalties* under the Agricultural Adjustment Act. It held, with Justices Burton and Rutledge dissenting, that such penalties should not bear interest for the period between the date the penalties became due and the date judgment was entered therefor, and that the failure to mention interest in the statutes should not be interpreted as precluding the granting thereof. In so holding, the court specifically drew a distinction between penalties and fines, on the one hand, which are imposed as punishment or as a deterrent, and, on the other, obligations to one who has suffered actual money damages by another's breach of such obligations and should be fairly compensated therefor. The court explained, at page 373 of 332 U.S. at page 7 of 68 S.Ct., 92 L.Ed. 3:

> " * * * the failure to mention interest in statutes which create obligations has not been interpreted by this Court as manifesting an unequivocal congressional purpose that the obligation shall not bear interest.

---

1. § 10(c) of the National Labor Relations Act, 29 U.S.C.A. § 160(c), empowers the Board " * * * to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this (Act) * * *."

Billings v. United States, 232 U.S. 261, 284–288, [34 S.Ct. 421, 425–427, 58 L.Ed. 596]. For in the absence of an unequivocal prohibition of interest on such obligations, this Court has fashioned rules which granted or denied interest on particular statutory obligations by an appraisal of the congressional purpose in imposing them and in the light of general principles deemed relevant by the Court. See, e. g., Royal Indemnity Co. v. United States, supra [319 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361]; Board of Comm'rs v. United States, 308 U.S. 343 [60 S.Ct. 285, 84 L.Ed. 313].

"As our prior cases show, a persuasive consideration in determining whether such obligations shall bear interest is the relative equities between the beneficiaries of the obligation and those upon whom it has been imposed. And this Court has generally weighed these relative equities in accordance with the historic judicial principle that one for whose financial advantage an obligation was assumed or imposed, and who has suffered actual money damages by another's breach of that obligation, should be fairly compensated for the loss thereby sustained. See, e. g., Brooklyn Savings Bank v. O'Neil, supra [324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296]; United States v. North Carolina, 136 U.S. 211, 216 [10 S.Ct. 920, 34 L.Ed. 336]; Funkhouser v. J. B. Preston Co., 290 U.S. 163, 168 [54 S.Ct. 134, 136, 78 L.Ed. 243].

"The contention is hardly supportable that the Federal Government suffers money damages or loss, in the common law sense, to be compensated for by interest, when one convicted of a crime fails promptly to pay a money fine assessed against him. The underlying theory of that penalty is that it is a punishment or deterrent and not a revenue-raising device; unlike a tax, it does not rest on the basic necessity of the Government to collect a carefully estimated sum of money by a particular date in order to meet its anticipated expenditures. For the foregoing reasons this Court's holding that a criminal penalty does not bear interest, Pierce v. United States, 255 U.S. 398, 405–406 [41 S.Ct. 365, 367, 368, 65 L.Ed. 697] is consistent with its holding that the Government does suffer recoverable damages if a taxpayer fails to pay taxes when due and is therefore equitably entitled to interest."

Nor are we impressed with the petitioner's argument that since for a relatively long period of time the Board, as a matter of policy, did not allow interest it should not now be permitted to change that policy. The Court of Appeals for the District of Columbia succinctly stated in International Brotherhood of Operative Potters v. N. L. R. B., supra, at 761 of 320 F.2d:

"In the evolution of the law of remedies some things are bound to happen for the 'first time.'"

We accordingly conclude that the Board acted well within its power in providing for the payment of interest on back pay awards. Such awards are in no sense penalties such as were involved in Rodgers. They were not to punish or deter but to *compensate* for the loss sustained by the employees who were wrongfully discharged. They are entirely remedial in character. Republic Steel Corp. v. N. L. R. B., 1940, 311 U.S. 7, 10, 61 S.Ct. 77, 85 L.Ed. 6; N. L. R. B. v. Cape County Milling Co., 8 Cir., 1944, 140 F.2d 543, 546. To make such employees whole, the provision for the payment of interest for the time the back pay was wrongfully withheld from them is only equitable. During that period the petitioner had the use of the money it wrongfully withheld and we can see no reason why it should not pay for its use. Based upon the Supreme Court's statement in Rodgers, we concur with the Second and Fourth Circuits and the Court of Appeals of the District of Columbia that the provision for the payment of

interest on back pay is proper and within the Board's power.

[6] Petitioner also challenges that portion of the Board's order which directs it to cease and desist from discouraging membership in the United Steel Workers of America "or in any other labor organization", on the ground that the company was not found to have engaged in violations against members of any union other than the United Steel Workers of America. In support of its contention that the words "any other labor organization" are too broad, petitioner cites N. L. R. B. v. Express Publishing Co., 1941, 312 U.S. 426, at page 433, 61 S.Ct. 693, at page 698, 85 L.Ed. 930, in which the court said:

"* * * It is obvious that the order of the Board, which, when judicially confirmed, the courts may be called on to enforce by contempt proceedings, must, like the injunction order of a court, state with reasonable specificity the acts which the respondent is to do or refrain from doing. It would seem equally clear that the authority conferred on the Board to restrain the practice which it has found the employer to have committed is not an authority to restrain generally all other unlawful practices which it has neither found to have been pursued nor persuasively to be related to the proven unlawful conduct."

That was not the situation of which the petitioner complains here. That case is authority for prohibiting the Board from ordering an employer to cease and desist from *other unfair labor practices in which it has not been found to be engaged.* That situation is clearly distinguishable from the one in the instant case in which the order merely restrains petitioner from conducting against other labor organizations the same unfair labor practices in which it *has* been found to be engaged. This court in Morrison Cafeteria, supra, enforced an order of the Board reported at 135 N.L.R.B. 1327, 1339, which contained language identical with that complained of here. In N. L.

R. B. v. Express Publishing Co., supra, relied on by the petitioner herein, the court there also said at page 437 of 312 U.S., at page 700 of 61 S.Ct., 85 L.Ed. 930:

"* * * We hold only that the National Labor Relations Act does not give the Board an authority, which courts cannot rightly exercise, to enjoin violations of all the provisions of the statute merely because the violation of one has been found. *To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past."* (Emphasis supplied.)

Clearly here the restrained violations do bear complete resemblance to that which the employer has already committed. The petitioner here is merely restrained from doing the same thing not only to the United Steel Workers but also to "any other labor organization". See Allegheny Pepsi-Cola Bottling Co. v. N. L. R. B., 3 Cir., 1962, 312 F.2d 529, 532. The Board's "discretionary authority to fashion remedies to purge unfair labor practices", N. L. R. B. v. District 50, United Mine Workers, 1958, 355 U.S. 453, 458, 78 S.Ct. 386, 2 L.Ed.2d 401, has not been abused by the breadth of its proposed order herein. We find it entirely proper.

The petition to review and set aside is in all things denied. The Board's request for an enforcing decree will be granted.

MATTHES, Circuit Judge (dissenting in part).

Contrary to the holding of the opinion, I am not persuaded that the Board is authorized under Section 10(c) of the Act to award interest on the amount that may be due as back pay to the discharged employees. Certainly the failure of the Board to grant interest on such monetary awards for approximately 26 years prior to Isis Plumbing & Heating Co., 138

N.L.R.B. 716 (1962), does not in and of itself constitute an insurmountable barrier to a departure from such a policy. However, as stated so aptly by the dissent in Isis, 138 N.L.R.B. at 723–724:

"We believe that when a provision such as Section 10(c) of the Act has received such a long and consistent interpretation by this Board and the courts, with apparent congressional and judicial approval, it has become part of the administrative practice which, if it is to be changed, should now be changed by the Congress— and by the Congress alone."

In all other respects I concur in the opinion.