**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HOFFMAN–TAFF, INC., Respondent.**

**No. 16348.**

United States Court of Appeals
Eighth Circuit.

March 25, 1960.

**194**

Robert T. Thompson, Atlanta, Ga., made oral argument for respondent.

Robert Sewell, Washington, D. C., made argument on behalf of the Labor Board.

Before SANBORN, WOODROUGH, and MATTHES, Circuit Judges.

WOODROUGH, Circuit Judge.

This case is before the Court upon a petition of the National Labor Relations Board for the enforcement of its Order issued against respondent on June 1, 1959, pursuant to proceedings under the National Labor Relations Act, as amended, (61 Stat. 136, 29 U.S.C.A. § 151 et seq.). The Board's decision and Order are reported at 123 NLRB No. 164. This Court has jurisdiction of the proceedings as the unfair labor practices involved are alleged to have occurred at Springfield, Missouri, where the respondent, a Missouri corporation, manufactures chemicals for interstate commerce.

In effect, the Board found that the respondent in its successful effort to put an end to an attempt to organize a union of its employees violated §§ 8(a) (1) and 8(a) (3) of the Act in that it discharged its employee Bob Crowder, gave employee Jim Tice a penalty transfer, suddenly increased wages to dissipate the employees' interest in collective bargaining, and threatened and otherwise coerced some of them in the exercise of their statutory rights. The Board's Order requires respondent to cease and desist from the violations found, to reinstate Crowder, to make Crowder and Jim Tice whole for any loss of pay resulting from discrimination against them, and to post appropriate notices.

The respondent contends that the findings and conclusions of the Board are not supported by substantial evidence.

Specific facts are summarized for the Board, concededly with substantial correctness, "but incompletely," as follows:

"In March or April, 1958, the employees on respondent's midnight to 8 a. m. shift became interested in organizing a union. Employees Jim Tice and Bob Crowder acted for the group in making contact with the regional office of the Oil, Chemical, and Atomic Workers International Union, AFL–CIO. About the middle of April, Tice and Crowder, along with one other employee, had a meeting with a Union representative who was sent to Springfield to confer with

them. The organizational movement which began at this point seems to have spread to employees on the day shift, eventually, and made some headway until the first week or ten days in June. Respondent's president and general manager, Walter Hoffman, admitted hearing 'by rumor' that a union movement had started, and that Tice and Crowder, on the midnight shift, were the employees primarily responsible.

"On April 29, President Hoffman sent for Tice and told him that he was being transferred to the day shift forthwith in connection with some 'drastic policy * * * and personnel changes' which were being made to correct 'unrest in the plant.' The employee reminded Hoffman that he was teaching part time in the public schools, with respondent's knowledge and consent, and would have to break his teaching contract if he went on days, but the company president gave him no choice. The next day, after talking to his school principal, Tice asked Hoffman for an explanation of the abrupt transfer, pointing out that it entailed forfeiture of a month's pay under his teaching contract, as well as the night shift pay differential. Hoffman said he wanted Tice on the day shift to be 'looked over' for possible advancement. He mentioned that Tice might be considered for a future opening as personnel manager, but that 'in this type of job there is no question as to a man's loyalty to the company.' When Tice pressed Hoffman as to what he meant by this last remark, Hoffman replied there had been rumors to the effect Tice was an ' * * * organizer of unrest.'

"On May 3, in a speech delivered to the employees on each shift, President Hoffman stated that the plant was not operated as effectively as it should, but that he had already made some 'changes' to improve the situation. The Company president emphasized the point that the employees at this plant were enjoying steady employment 48 hours per week, under beneficial conditions, in spite of a business recession in the area, but he also stated that he hoped that wage 'changes' could soon be 'tied in' with 'more efficient production.' He announced that a Mr. Robert Thompson, a member of a 'consulting firm' had been retained to make a 'survey' of the plant's pay and fringe benefits, and would probably conduct a series of confidential interviews with employees for this purpose. 'There is one other thing that I want to mention that is very important,' Hoffman went on to say:

" 'I have heard rumors that are circulating concerning a union in this plant. I want to make my position at this time perfectly clear. I do not feel that you need a union in this plant. I am sure that the big majority of you agree with me that you do not need any outsider to handle your business. One of the first things a union would do would bring about a 40-hour week. You can figure what this will do to your earnings. You do not need to pay $5 or more per month dues for the privilege of working at this plant. I do not believe that you will let a union come into this plant and tell me how to operate it. I hope that is clear.'

"In spite of president Hoffman's remarks, the organizational movement picked up some momentum, and about 15 employees showed up at a meeting held by the Union at the 'Laborers' Hall' in Springfield on June 3. On June 2, the day before this meeting, president Hoffman again convened the employees at the plant and announced an across-the-board hourly wage increase of twenty cents per hour, effective retroactively to May 16. In announcing the increase, Hoffman admittedly 'pointed out the company growth and expressed the desire that the people there would stay and grow with it, and we could do it without having a union * * *.' The new rates were reflected in the pay-checks the employees received the following day.

"As noted above, it was the employees on the midnight shift, led by Tice and Crowder, who first took an interest in bringing the Union into the plant. On May 1, the day Tice's transfer to the day shift became effective, president Hoffman took two supervisors, William Zay and an

assistant, Robert Dameron, off the day shift and put them in charge of the midnight shift, replacing the single foreman who had previously been in charge at night. At about the same time, a list of Company rules was posted, one of which provided that ' * * * permission must be obtained before soliciting or collecting of any contribution on company premises.' These rules had not appeared on the bulletin board since April 1956.

"About June 1, Foreman Zay warned several of the third-shift employees against supporting the Union. Calling attention to the recently posted no-solicitation rule, the foreman remarked to employees Jerry Hubbard and Ivan Stewart that they ' * * * couldn't be discharged for union activities but there were ways.' Zay also warned employee Louis Lish ' * * * about talking union activities and being with the Union, that it was going to have to quit, that he had been warned before and it was too late not to, whether we changed or not, we was going to be fired.' On June 5, Zay approached Crowder and, after reminding him of his family responsibilities, told Crowder that the Company knew about the union movement, and that Tice and Crowder were behind it, and added that if they did not stop they were going to be fired. He also mentioned to Crowder that no one was perfect, and that ' * * * if necessary a trap could be laid.' Crowder was discharged five days later, under the circumstances described below.

"Immediately after Crowder was discharged on June 10, respondent's director of production, James W. Langston, asked Tice to go back on the midnight shift as Crowder's replacement. Langston reminded Tice at the time that the Company ' * * * knew of a good deal of unrest, even dissension * * * among the workers * * * and * * * had very strong rumors of his [Tice's] role in creating such dissension.'

"At a second Union meeting, held during the first week in June, only two employees showed up. About June 17, a week following Crowder's discharge and Tice's return to the midnight shift, president Hoffman transferred Zay back to the day shift, leaving only one supervisor in charge at night, as before. Meanwhile, the Union's charge in this case had been filed with the Board on June 12. In talking to employee Lish some time after that, Zay declared that he knew which of the employees were union members, who had gone to the first Union meeting, and who had 'been going to the NLRB.' The foreman went so far as to claim that he had read the 'affidavits' employees had furnished the Board, but refused to tell Lish how he had obtained his information.

"Crowder had worked for respondent as a laboratory assistant some years before, had been laid off, and was then reemployed in February 1957 as a chemical operator in the midnight shift. He worked continuously in that position until June 10, 1958 when he was fired at president Hoffman's order, ostensibly for sleeping on the job on June 4. As indicated above, Crowder had collaborated with Tice in starting the abortive Union drive, and his activity in this connection had admittedly come to president Hoffman's attention.

"Crowder's job as a chemical operator entailed sitting in a chair for much of his shift time, 'watching the reactors,' in a detached area of the plant where no other employees were normally stationed. It was a soporific job, with the machinery constantly humming, and Crowder freely admitted, in testifying at the Board hearing, that he had dozed off at times, specifically during May. The employee positively denied, however, that he had ever been warned for dozing, as claimed by Zay, or that he had fallen asleep on June 4—the date mentioned by production director Langston in discharging him—or at any time after June 1. Indeed, he testified that foreman Zay and the assistant foreman, Dameron, made it their practice to visit his work place 'practically all the time' during that period; and that Zay, on June 5—the day after the alleged sleeping incident—had called him off the job to warn him that

he would be 'trapped' and fired if he didn't stop his Union activity.

"The Trial Examiner, who found Crowder an 'intelligent, honest witness, worthy of belief' credited his testimony as to the foregoing conversation and transactions. Accordingly, the Examiner concluded that the employee 'was not asleep on the job on June 4 and that Hoffman did not believe that he had been asleep.'"

The respondent says the statement of the case is incomplete and stresses that there was also evidence that at about the same time when the employees were engaging in their union organization activities its management was undertaking corrective measures to overcome production difficulties it had found to result from inefficient supervision and lack of discipline among its employees, particularly in the night shift to which the employees Crowder and Tice belonged. The supervisor who had been on the night shift was replaced by a day shift foreman named Zay, and by Bob Dameron, a day leadman, and they maintained closer supervision and stricter discipline than had prevailed.

Our study of the whole case convinces that all of the findings and conclusions of the Board are supported by substantial evidence except those relating to the discharge of the employee Robert E. Crowder Jr. It should be conceded that respondent was shown to have been well aware that Crowder was a leader in the organizing effort at the plant and that discharging him would be and was a very important factor in preventing the organization of a labor union there, but the finding of the examiner adopted by the Board was that the president of respondent who ordered the discharge of Crowder on the asserted ground that he had repeated his fault of sleeping on the job four times including once on June 4th, 1958 did not believe that Crowder had been asleep on his job on the last named day.

We do not find any evidence in the record to support this finding as to Hoffman's belief. Crowder testified that he

had been found by the substituted supervisor "dozing," or as they said, "asleep" on the job on three dates during the month of May. He denied being found asleep on the job on June 4th. Foreman Zay, however, gave an account of coming upon both Crowder and his trainee Peabody asleep at their post on the fourth day of June as follows:

"Q. Was there any other time you caught Mr. Crowder asleep on the job? A. Yes, sir.

"Q. When was that? A. June 4th.

"Q. What time of the night was it? A. It was about 2 a. m.

"Q. Where did you enter the building? A. I came in the side door again.

"Q. Was this in the building where he was regularly working? A. Yes, sir.

"Q. And what did you observe when you walked in the building? A. Mr. Peabody was asleep lying on the floor and Mr. Crowder was in the chair again.

"Q. Was Mr. Crowder asleep or awake? A. Mr. Crowder was asleep.

"Q. What did you do upon entering the building? A. I made a direct contact with the two boys.

"Q. What did you do then? A. I went over and I woke the two boys.

"Q. How did you awake them? A. Peabody in the usual manner, I gave him the kick again that I was accustomed to doing.

"Q. What did you do to Crowder? A. Mr. Crowder had the shake on the shoulder and he got up."

Zay reported the instances when Crowder was found sleeping on his job to the president, Mr. Hoffman, and Mr. Hoffman testified that after the first time he instructed Zay to warn Crowder that a repetition would result in discharge. The second time he instructed

Zay to tell Crowder that "if there was one more incident he would be discharged definitely." Hoffman further testified that after receiving Zay's report of Crowder's June 4th sleeping on the job he "waited till he could get all the facts straightened out where normally it would have been an automatic dismissal." He said he was "busy," "snowed under," and "that following Sunday [after June 4th] was the first chance I had to do it, where I asked Mr. Zay to come to my house which he did and go over the whole thing, all the facts, realizing that he [Crowder] was interested in the Union, at least that's the rumors I had, I didn't like to move immediately, knowing not completely, but having some idea of legal liability of discharging an employee who is involved in union activity." After interviewing Zay he issued the instruction to discharge Crowder which was carried out and he testified that the reason was "for being asleep on the job four times."

The operations of respondent's plant in the manufacture of chemicals involve risk of explosion. Two serious ones occurred since 1946 resulting in "tremendous property damage, well over $100,-000.00" and "in the first one, one man was killed." The last explosion was of the identical product Crowder was responsible for in the same building where he was working.

Manifestly, Hoffman and his company would have been in an inexcusable position in the event of another explosion from the same operation in face of a showing that the president had sanctioned such repeated sleeping on the job there as Zay reported in respect to Crowder.

■ This Court firmly adheres to the position heretofore declared that "the Board has the right to decide [in the trial of unfair labor practices] not only whether there was a proper cause for the discharge of the employees in question, but also, conceding such cause,

whether the [employer] acted upon it, or for reasons prohibited by the Act." Onan v. N. L. R. B., 8 Cir., 139 F.2d 728, 730. So far as an imponderable is presented depending upon what occurred in the mind of the one who did the discharging, the settlement of it must rest with the Board. But the question as to what facts were brought to the discharging agent's knowledge is of a different character. Hoffman had no means of knowing of Crowder's conduct other than the reports made to him. He did not make personal inspection of the night shift operations. When Zay reported Crowder's going to sleep on the job for the fourth time within a short period it would seem Hoffman could only be excused from taking action against Crowder if other evidence had come to him making him aware that Zay's report to him was false. But in the absence of such other evidence the finding by the Board that Mr. Hoffman did not believe that Crowder had offended for the fourth time on June 4 is unsupported.

■ The Board's decision indicates that it realized fully the seriousness of Crowder's fault in repeatedly going to sleep on his job and that his firing by Hoffman constituted an unfair labor practice only because of the disbelief of reports made to him which it attributed to Hoffman. We conclude that the Board's order for reinstatement of Crowder with back pay may not be enforced.

The finding of discrimination against Tice, of coercion, of threats of reprisal, of surveillance and creating the impression of surveillance and of granting a wage increase all to discourage union activities are supported by substantial evidence.

Enforcement of the Board's order is granted and respondent shall post notices as ordered except that it is not required to reinstate in its employment or make whole Robert E. Crowder Jr., or to include reference to him or to discharge of employees in the posted notice.

Enforcement in part ordered.