**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**BYRDS MANUFACTURING CORPORA-
TION, Respondent.**

**No. 17329.**

United States Court of Appeals
Eighth Circuit.

Nov. 21, 1963.

Allen M. Hutter, Attorney, N.L.R.B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Warren M. Davison, Attorney, N.L.R.B., Washington, D. C., on the brief, for petitioner.

Wilson Sims, of Bass, Berry & Sims, Nashville, Tenn., for respondent.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and DAVIES, District Judge.

BLACKMUN, Circuit Judge.

The National Labor Relations Board seeks enforcement here, pursuant to § 10 (e) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(e), of its 3-member-panel order issued December 18, 1962, with respect to Byrds Manufacturing Corporation. The decision and

order are reported as 140 N.L.R.B. No. 14. The Board adopted the trial examiner's findings and conclusions that Byrds had violated § 8(a) (1) and (3) of the amended Act, 29 U.S.C.A. § 158(a) (1) and (3). Its order requires, as the examiner recommended, that Byrds cease and desist from the unfair labor practices found to have been committed, reinstate four named employees without prejudice to their seniority and with full protection for any loss of earnings, and post the usual notices. With one member disapproving, the Board also modified the examiner's recommended order by adding a provision that the employer's back pay obligation include 6% interest. The union concerned is International Ladies Garment Workers Union AFL–CIO.

Byrds is an Arkansas corporation engaged since 1956 in the manufacture of clothing. Its plant is in Star City, Arkansas. It is the sole manufacturing industry in predominantly rural Lincoln County. It employs about 700 persons. Over 600 are non-supervisory production and maintenance employees and of these a substantial majority are women. Byrds occupies its plant under a lease-purchase agreement with Star City Industrial Corporation. The latter's main function is to bring industry to the area.

The controversy concerns (a) alleged interference and restraint of employees by interrogation and threats to move or close the plant if it were organized and (b) alleged discriminatory discharges of employees Mary Whitten, Merlene Deweese, Lola Fay Craig, and Bobby McGriff because of their union activities and sympathies. By its answer to the Board's petition Byrds "denies that the factual determinations set forth in the decision and order * * * are supported by substantial evidence on the record considered as a whole and * * * avers that, in fact, there is no substantial evidence to support the findings of unfair labor practices * * *." The primary issue before us, then, is simply that of the sufficiency of the evidence.

The record establishes—and Byrds by its brief accepts these facts—that employee Whitten and her sister Margie Hackney, also an employee, in April 1961 made inquiry of the union about organizing the plant; that in June an organizer visited with them, with employee Deweese who was a third sister, and with a fourth employee; that on August 18 organizers distributed leaflets to Byrds' employees as they reported for work; that later that morning B. S. Hundley, President of the Industrial Corporation, telephoned plant manager Evans and asked for permission to speak to the employees; that this request was granted and 11:15 A.M. suggested as a convenient time; that at that hour Hundley, other officials of the Industrial Corporation, the sheriff and a local policeman arrived at the plant; that all employees, including supervisors, were called off work and assembled near the front of the plant; that Hundley addressed them for ten or fifteen minutes; that he said the trouble would be stopped, unions break up homes and divide communities and plants have been known to move out when unions move in; that another official of the Industrial Corporation spoke for about five minutes to the effect that unions only wanted to bring Communism into the plant; that Hundley, a realtor, then said he was willing to reduce rents on houses leased to employees if out-of-towners wanted to move into Star City; that during these speeches manager Evans sat in his office in which there was a loud speaker; that from the office he could observe the employees and listen to the talks; that two of the organizers were arrested that afternoon and were convicted and fined for violation of a local ordinance requiring labor organizers to pay for the privilege of organizing; that this was reported in the local newspaper; that on September 13 an organizer met with 35 or 40 employees at Hackney's home; that he recruited some of these, including Whitten, Deweese, Craig and McGriff, to serve on an organizing committee; that thereafter members of this committee discussed the union with employees and distributed authorization cards; that on September 14 Deweese

was discharged; that shortly before September 19 Evans addressed the employees and explained a new bonus system being introduced for production workers and told them the company now had a large order for dusters; that on September 20 Whitten, Craig and McGriff were terminated; that on September 22 Byrds was informed by telephone of the contents of a telegram being sent to it by the union; that this telegram contained the names of some of the persons on the employees' committee and of the union's intent to organize the plant; that on that afternoon Evans assembled the employees and talked to them for thirty minutes; and that he discussed generally the disadvantages of the union, the benefits the employees already had without the union and the possibility of future strikes and stated, among other things, that there was no law which required the company to stay open, that management controlled, that union trouble sometimes forced companies to shut down, and that of the 14 employees on the organizing committee, 7 were no longer employed.

There is some conflict in the evidence as to the respective discharges of the four employees. This naturally provokes controversy between the Board and Byrds. It would serve no useful purpose for us to recite the evidence as to this in detail. Both Byrds and the Board are fully acquainted with it and a lengthy discussion would be of little precedential help in future cases. It suffices to note only the following:

a. The female employees Deweese, Whitten and Craig had all been "good" sewing machine operators and were among the best in their production lines. Not one of them, however, was making her production quota. Each of the three asserted a valid reason for this. On the other hand, management claimed a valid reason for their discharges.

b. The male employee, McGriff, started work with Byrds in 1958 as a bundle boy on the cuff line. Shortly thereafter he went into military service. When he returned in July 1961, he was given work as a shirt stacker, a job usually handled by a woman. He performed this work at least fairly satisfactorily. On September 19 he was told he was being promoted to bundle boy in the duster department. A female employee was transferred to replace him on the stacking job. That same day his new supervisor complained about his work. The following day he complained that one of the operators supplied by McGriff had been allowed to be out of work. At the end of the day the supervisor told McGriff he could not use him. His shirt stacking job having been filled and the plant manager being unwilling to overrule the operational decisions of his supervisors, McGriff was offered a night production job. He turned this down. The position of the Board is that, as McGriff described it, he had been given a "dirty deal" and that his termination was due to a reason not connected with his work. Byrds' position is that McGriff was not doing satisfactory work at his new assignment.

More generally, the employer urges that during the period of the discharges of these four employees there were eight others also discharged for low production; that there was no pattern of termination aimed at union activists; that some members of the organizing committee were not working when Byrds learned of its composition and others later quit; that some were still working; that the supervisors had no means of knowing, before their respective terminations, that the four were members of the union; and that, in particular, there is nothing in the record as to the employer's knowledge of Deweese's union activity prior to her discharge on September 14. The Board, in turn, urges generally that the terminations were obviously contrived and pretextuous; that the women were among the highest producers; and that the shift of McGriff from a job satisfactorily performed on one day to another said to be so poorly performed as to result in discharge the following day does not ring true.

We have reviewed the record before us carefully and in detail and in the light of the familiar precepts of Universal

**332**

Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We conclude that, on both the § 8(a) (1) interference issue and the § 8(a) (3) discharge issue, the Board's findings, despite the parties' opposing interpretations and conflicts in the testimony, are "supported by substantial evidence on the record considered as a whole", within the standard so prescribed by § 10(e) of the Act and Universal Camera.

■■■ 1. The § 8(a) (1) issue. There is evidence to the effect that Mc-Griff several times was asked by a supervisor as to how he felt about the union; that on September 19 he was accused by another supervisor of having attended a union meeting; that he was then told that it was known Whitten and Craig also attended; that he was also told Evans had a list of those employees who attended and passed this information on to supervisors; that employee Weast had inquired of a supervisor as to how he felt about the union and the supervisor had said that Byrds would close down if the union came in; that still another supervisor said the same thing to Mc-Griff; and that Hundley's speech to the employees embraced a threat of a plant move if it were organized.

This is enough to constitute substantial evidence. Of course the record contains denials of these facts and there are the usual complaints as to the trial examiner's and the Board's actions with respect to the credibility of witnesses. The question of credibility, however, is primarily a matter for Board determination. N. L. R. B. v. Morrison Cafeteria Co., 311 F.2d 534, 538 (8 Cir. 1963); Paramount Cap Mfg. Co. v. N. L. R. B., 260 F.2d 109, 113 (8 Cir. 1958).

■■ While there could have been some question as to whether Hundley's remarks are attributable to Byrds, the Board found that he acted in the capacity of an agent and rested this finding on his being granted permission to speak at a suggested time during the working day, his being furnished with facilities and a microphone, the assemblage of the employees, and the plant manager's aware-

ness of his statements and failure to disavow. This is enough to sustain the finding. N. L. R. B. v. American Furnace Co., 158 F.2d 376, 379 (7 Cir. 1946). See N. L. R. B. v. Solo Cup Co., 237 F.2d 521, 523–524 (8 Cir. 1956) and N. L. R. B. v. International Bhd. of Boilermakers, 321 F.2d 807 (8 Cir. 1963). There is more in this record than the mere suspicion which this court has held to be insufficient for enforcement of a Board order. See Osceola County Co-op. Creamery Ass'n. v. N. L. R. B., 251 F.2d 62, 68–69 (8 Cir. 1958); N. L. R. B. v. Montgomery Ward & Co., 157 F.2d 486, 491 (8 Cir. 1946); Bituminous Material & Supply Co. v. N. L. R. B., 281 F.2d 365, 367 (8 Cir. 1960); Local No. 3, United Packing House Workers v. N. L. R. B., 210 F.2d 325, 331 (8 Cir. 1954), cert. denied 348 U.S. 822, 75 S.Ct. 36, 99 L.Ed. 648.

We find support for our conclusion on this § 8(a) (1) issue in the following cases: N. L. R. B. v. Wilson Concrete Co., 304 F.2d 1 (8 Cir. 1962); N. L. R. B. v. Des Moines Foods, Inc., 296 F.2d 285 (8 Cir. 1961); Kingsbury Elec. Co-op. v. N. L. R. B., 319 F.2d 387, 391 (8 Cir. 1963); Bituminous Material & Supply Co. v. N. L. R. B., supra, p. 369 of 281 F.2d; N. L. R. B. v. Solo Cup Co., supra, p. 523 of 237 F.2d; Marshfield Steel Co. v. N. L. R. B., 324 F.2d 333 (8 Cir. 1963).

■ 2. The § 8(a) (3) issue. These discharge issues are difficult and sensitive when termination coincides with union activity. The employee and the Board present plausible cause for continued employment—a good record, superior comparative production, recent change in assignment, lack of individual warning, and the like—and would tie his discharge solely to union sympathy or activity known to the employer. Management in turn presents equally plausible cause for the discharge—under-production, production not in line with ability, troublemaking, attitude, undesirable effect on fellow employees, similar contemporaneous discharges of non-union employees, and the like,—and would tie the discharge to time-honored and accepted

management prerogatives wholly unrelated to union activity or sympathy and here accentuated by the heavily competitive demands of the textile industry. The trier of fact must chose between these two. Again its decision, although always outrageous to the losing party and hard for it to accept, is, if supported by an adequate evidentiary basis, not to be retried by this court.

■ Once more we encounter conflict in the evidence and argument as to the credibility of witnesses. But on the discharge issue, too, these are matters for the trier of fact and not for this court, and here again we find sufficient support in the record for the findings made by the Board. Comparable cases are N. L. R. B. v. Wilson Concrete Co., supra; N. L. R. B. v. Des Moines Foods, Inc., supra; N. L. R. B. v. Twin Table & Furniture Co., 308 F.2d 686 (8 Cir. 1962); Bituminous Material & Supply Co. v. N. L. R. B., supra, pp. 368–369 of 281 F.2d; N. L. R. B. v. Standard Metal Fabricating Co., 297 F.2d 365, 366 (8 Cir. 1961); I. C. Sutton Handle Factory v. N. L. R. B., 255 F.2d 697 (8 Cir. 1958), cert. denied 358 U.S. 865, 79 S.Ct. 97, 3 L.Ed.2d 98; Marshfield Steel Co. v. N. L. R. B., supra. The fact McGriff was offered a less desirable assignment does not affect the result as to him. N. L. R. B. v. Des Moines Foods, Inc., supra, p. 290 of 296 F.2d; N. L. R. B. v. Hoffman-Taff, Inc., 276 F.2d 193 (8 Cir. 1960); Texarkana Bus Co. v. N. L. R. B., 119 F.2d 480, 485 (8 Cir. 1941).

■ There remains only the question of the interest allowance on the back pay award. Another panel of this court, with one dissent, has just approved an interest allowance. Marshfield Steel Co. v. N. L. R. B., supra, pp. 337–339 of 324 F.2d. Although counsel for the Board, with our leave, has filed a supplemental memorandum on this point, counsel for Byrds has not done so and relies, instead, on the employer's basic position that no back pay is due. Under these circumstances we see no reason to deny enforcement as to this detail. See Reserve Supply Corp. v. N. L. R. B., 317 F.2d 785, 789 ( 2 Cir.

1963); International Bhd. of Operative Potters v. N. L. R. B., 320 F.2d 757, 760–761 (D.C.Cir. 1963); N. L. R. B. v. Globe Products Corp., 322 F.2d 694 (4 Cir. 1963); N. L. R. B. v. Adams Dairy, 322 F.2d 553 (8 Cir. 1963).

The petition for enforcement is granted.