**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**RALPH PRINTING AND LITHOGRAPH-
ING COMPANY, Respondent.**

No. 18570.

United States Court of Appeals
Eighth Circuit.

July 6, 1967.

Nancy M. Sherman, Atty., N.L.R.B., for petitioner and Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and Anthony J. Obadal, Atty. for N.L.R.B., were on the brief.

John E. Tate of Nelson, Harding, Acklie, Leonard & Tate, Omaha, Neb., for respondent and filed brief.

Before MATTHES, BLACKMUN and MEHAFFY, Circuit Judges.

MATTHES, Circuit Judge.

This case is before the Court upon the petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. §§ 151–168 (1959), for enforcement of its order issued June 6, 1966 against Respondent Ralph Printing and Lithographing Company. The Board's decision and order are reported at 158 N.L.R.B. No. 128. No jurisdictional issue is presented. We modify the order as hereinafter set out and grant enforcement of it as so modified.

Respondent, a Nebraska corporation, is engaged in the business of commercial printing and lithographing in Omaha, Nebraska. During September, 1964 the Lithographers and Photoengravers International Union, AFL-CIO, Local 38 L,[1] began a union organizational drive among Respondent's employees. On the evening of September 18, 1964 the Union representative, Melford L. Galbraith, held a meeting with the employees and distributed authorization cards to them. Galbraith explained that in signing the

1. Local 38 L was later redesignated as Local 203 as a result of a merger with Local 43 P of the same Union.

authorization cards the employees were authorizing the Union to act as their collective bargaining representative, that the cards would enable him to demand recognition, and that if recognition were granted the Union would proceed to negotiate with Respondent. Nineteen authorization cards were signed by the employees on September 18th. During the next ten days Galbraith obtained a total of 24 authorization cards in a unit later found to comprise a total of 26 employees.[2]

Armed with his authorization cards Galbraith conferred with Roy and John Ralph, Respondent's President and Vice-President, and requested recognition for the Union. He asserted that his Union held signed authorization cards from a substantial majority of Respondent's employees, numbering over 90%. Roy Ralph refused the request for recognition and expressed a desire to proceed only through a Board election. Galbraith offered to submit the authorization cards to a mutually acceptable third party to determine the Union's majority status, but Ralph declined the offer and reaffirmed his intention to await the outcome of a Board election. Galbraith informed the Ralphs that his Union represented all of Respondent's production and maintenance employees, including pressmen. Mr. John Ralph denied the purport of this conversation and stated that Galbraith did not specify the composition of the unit he was seeking to represent, and thus left him in doubt as to whether office-clericals, supervisors and certain other employees were included in the unit sought to be represented.

On the same day, after the conference, Galbraith filed a petition with the National Labor Relations Board requesting a representation election among Respondent's employees. On October 29th, a pre-election hearing was held and on November 20th, the Regional Director ordered an election to be conducted on January 7, 1965.

Subsequently on December 24, 1964 Respondent's employees, whose normal quitting time was 4:00 P.M., worked through their half-hour lunch period and were released at 1:00 P.M. in the afternoon without loss of pay. Similarly on December 31, 1964 the employees were released at 3:00 P.M., one hour early. Several employees disclosed that Respondent had no set policy on the amount of time off granted on a day preceding a holiday, but that such time off fluctuated with the amount of work orders that had to be filled. The past practice of Respondent, however, as revealed by the testimony of employees Ray Angus and Virgil DeMars, was usually to grant approximately an hour off before Christmas, and little or no time off prior to New Years.

On January 4, 1965, three days before the scheduled election, Supervisor Donald Higgins approached Ray Angus, a linotype operator employed by Respondent for ten years, at his work station and inquired whether Angus intended to attend the union meeting that night. Upon being advised that Angus would attend, Higgins purportedly asked Angus so advise him as to who was present at the meeting. Angus further testified that Higgins requested him to ask certain questions at the meeting relating to the Union's contract with another printing company. Angus further asserted that on January 6th Higgins thanked him for asking several questions at the meeting. Higgins categorically denied having any such conversation with Angus.

The following morning, the Secretary-Treasurer of the Company, Sylvia Fitch Middleton, showed Angus a pink scratch pad on which were written the names of twelve employees who had attended the union meeting the previous evening. Angus testified that Miss Fitch asked him to verify the correctness of the list, and he replied that it was correct. Miss Fitch also inquired of

---

**2.** On November 20, 1964 the Board's Regional Director found the appropriate collective bargaining unit to consist of all of Respondent's production and maintenance employees, a total of 26 employees.

Angus whether an employee, John Dormer, or any of the "new help" attended the union meeting. Subsequently, Angus told three of his fellow employees that the Company had a list of those who had attended the meeting. Miss Fitch repudiated the existence of any such list and denied questioning any employee with reference to his or his co-worker's union activities.

On January 7th the Board conducted an election among Respondent's eligible maintenance and production employees. The Union lost by a narrow margin of 13 to 12. Angus' undisputed testimony, corroborated in substance by Virgil DeMars, was to the effect that immediately following the balloting, Vice-President John Ralph happily announced the results of the election, and thanked those employees who had confidence in voting for the Company. Ralph asserted there would be no changes within thirty days and that it would take that long before there would be any improvements. On January 12th, the Union filed timely objections to conduct affecting results of the election. During the pendency of these objections Respondent's employees received a notice on February 12th that they would receive a ten cent per hour increase in pay effective February 19th.

On the above facts the Board found that Respondent violated Section 8(a) (1) of the Act by coercively interrogating employee Angus about his union activities, by requesting him to report on the union activities of his fellow employees, and by creating the impression of surveillance among the employees. The Board also found that Respondent violated Section 8(a) (1) by granting its employees benefits prior to the election and by promising and granting them benefits immediately thereafter, during the period in which objections to the election could be filed. The Board further concluded that Respondent violated Section 8(a) (5) and (1) by refusing to bargain with the Union on or after October 5th, at which time the Union represented a majority of its employees.

The Board ordered Respondent to cease and desist from the unfair labor practices found, and, upon request, to recognize and bargain collectively with the Union.

## SECTION 8(a) (1)—INTERROGATION AND IMPRESSION OF SURVEILLANCE.

■ Contrary to Petitioner's intimation, the record in this case does not disclose a background of open hostility to the Union by the Respondent. These alleged Section 8(a) (1) violations are based almost exclusively on the testimony of a single employee, Ray Angus, whose testimony was controverted throughout by several of Respondent's witnesses. We are mindful, however, that questions of credibility are primarily a matter for Board determinations and not for this Court. N. L. R. B. v. Comfort, Inc., 365 F.2d 867, 871 (8th Cir. 1966); N. L. R. B. v. Morrison Cafeteria Co. of Little Rock, Inc., 311 F.2d 534, 538 (8th Cir. 1963).

■ Accepting Angus' version of the situation, on a single occasion one of Respondent's supervisors, Donald M. Higgins, inquired of Angus' union activities, and asked him to report to the Company on the union activities of his co-workers. An employer's interrogation of its employees, however, is not unlawful per se, unless conducted with such anti union animus as to be coercive in nature. Higgins' interrogation of Angus, not in itself threatening or coercive, would not violate Section 8(a) (1) unless it were conducted against a background of employer hostility and discrimination towards unionization, such as would induce in its employees a fear of reprisal for lawfully pursuing their union activities. Banner Biscuit Company v. N. L. R. B., 356 F.2d 765, 769–70 (8th Cir. 1966); N. L. R. B. v. Ritchie Manufacturing Company, 354 F.2d 90, 99 (8th Cir. 1965). Cf. N. L. R. B. v. Morris Novelty Co., Inc., 378 F.2d 1000 (8th Cir. June 19, 1967). The circumstances surrounding Higgins' interrogation negative any inference of

coercion. The questioning of Angus was not part of any employer plan of systematic intimidation of its employees, but at best was isolated and casual in nature. The questioning, moreover, was totally devoid of any coercive statements, which are usually characteristic of an unlawful interrogation. This isolated form of interrogation, we believe, was insufficient to violate the rights of Respondent's employees under Section 8(a) (1). In summary, we believe that the Board's finding of a coercive interrogation is not supported by substantial evidence in the record.

■ We are not prepared, however, to accord similar protection for the more aggravated demeanor of Miss Fitch. Her conduct, we feel, inhibited the employees' pursuit of their union activities. Miss Fitch attempted to verify on the Company's behalf the names of those employees who had attended a previous union meeting. The evidence relating to this charge fully supports the finding that Angus and the three other employees to whom he disclosed the existence of the list of Union adherents were left with the clear impression that Respondent was keeping its employees' union activities under surveillance. An impression of surveillance might well instill in the employee a fear of reprisal from the employer. Such conduct is violative of Section 8(a) (1) as it could inhibit the right of employees to pursue their union activities untrammeled by the fear of possible employer economic coercion or other forms of retaliation. See, e. g., N. L. R. B. v. Community Motor Bus Company, 335 F.2d 120, 122 (4th Cir. 1964); Hendrix Manufacturing Company v. N. L. R. B., 321 F.2d 100, 104–105 (5th Cir. 1963); N. L. R. B. v. United Wire and Supply Corporation, 312 F.2d 11, 13 (1st Cir. 1962); N. L. R. B. v. Des Moines Foods, Inc., 296 F. 2d 285, 287 (8th Cir. 1961); N. L. R. B. v. Hoffman-Taff, Inc., 276 F.2d 193, 198 (8th Cir. 1960).

## SECTION 8(a) (1)—PRE-ELECTION AND POST-ELECTION BENEFITS.

■ The Board found that Respondent's conferral of economic benefits during the election period in the form of increased holiday time on December 24, 1964 and December 31, 1964 violated Section 8(a) (1) of the Act. There is no doubt that the granting or announcement of economic benefits during a union organizational campaign or during the pendency of a representation election constitutes unlawful interference with the employees' protected right to organize. National Labor Relations Board v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). We are convinced, however, that the benefits conferred by Respondent here fall far short of the economic benefits condemned in *Exchange Parts Co.,* supra. In the latter case, one of the economic benefits found to be a violation of the Act was an extra "floating holiday," which would be taken on the employees' respective birthdays. In questioning the propriety of such benefits, the Court stated:

"We think the Court of Appeals was mistaken in concluding that the conferral of employee benefits while a representation election is pending, for the purpose of inducing employees to vote against the union, does not 'interfere with' the protected right to organize.

" * * * We have no doubt that it [Section 8(a) (1)] prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." 375 U.S. at 409, 84 S.Ct. at 459.

The record here, however, does not permit the inference that Respondent intentionally deviated from an established practice as to pre-holiday time off for the purpose of inducing its employees

to vote against the Union. On the contrary the testimony of several employees and management representatives unequivocally established that Respondent had no established policy as to the allotment of pre-holiday time off but that such time off was proportionate to its workload. It was customary to release the employees approximately an hour ahead of time. In view of Respondent's flexible policy, we do not consider the additional two and one-half hours on December 24th and the one hour on December 31st materially significant. Rather, we think, it falls within the "de minimis" rule and does not violate Section 8(a) (1).

Respondent's post-election benefits, however, stand on a somewhat different footing. Immediately following the favorable results of the election, before the Union had an opportunity to file its objections to the election, Respondent, through its Vice-President, John Ralph, suggested to its employees that there would be "improvements" after thirty days. In the interim, on January 18th, the Union filed its unfair labor practice charges with the Board to upset the election. Despite the pendency of these objections, however, Respondent initiated its improvements in the form of a ten cent per hour wage increase.

In light of Respondent's pre-election conduct, the likelihood that the Union would file objections to the conduct of the election cannot be considered remote. The impact of Respondent's well timed wage increase is clear, for it would tend to seriously impinge on the employees' choice of a bargaining representative in the event the Board ordered a second election. The announcement of the wage increase and the increase itself were clearly tantamount to an expression of approval by the Company of the Union's defeat.

■ The timeliness of Respondent's announced benefits as well as their unconditional nature warranted the inference that further benefits would be forthcoming if there were a continued rejection of unionization. We cannot ignore the effect on the employees' freedom of choice which such post-election benefits may have, particularly where a second election is ordered. For these reasons we feel that such benefits plainly violate Section 8(a) (1). Cedartown Yarn Mills, Inc., 84 N.L.R.B. 1, 8, enforced per curiam, Cedartown Yarn Mills, Inc. v. N. L. R. B., 180 F.2d 579 (5th Cir. 1950); The Hills Brothers Company, 67 N.L.R.B. 1249, 1255, enforced per curiam, N. L. R. B. v. Hills Bros. Co., 161 F.2d 179 (5th Cir. 1947); Northwest Engineering Company, 148 N.L.R.B. 1136, 1144–45 (1964). See also Amalgamated Clothing Workers v. N. L. R. B., 345 F.2d 264, 266 (2d Cir. 1965) (half a day off without loss of pay to celebrate defeat of union).[3]

### SECTION 8(a) (5)—REFUSAL TO BARGAIN.

■ The Board found that Respondent violated Section 8(a) (5) of the Act by refusing to recognize and bargain with the Union as the authorized collective bargaining representative of a majority of its employees. The Respondent, despite the uncontradicted evidence that the Union represented an overwhelming majority of its employees, persistently demanded that the representation question be determined through the process of a Board conducted election. Respondent, however, has no such vested right to an election. Where a labor organization has been designated by a majority of the eligible employees as their representative in an appropriate bargaining unit, the employer must recognize and bargain with

3. In N. L. R. B. v. Ambox, Incorporated, 357 F.2d 138, 141 (5th Cir. 1966), the Company's grant of benefits while objections to the election were pending was not considered to violate Section 8(a) (1). The Court made it clear, however, that the increases were to be granted retroactively as soon as the election objections were cleared up, and the promise of benefits was not made dependent on the outcome of the election proceeding.

such an organization, irrespective of whether or not it has been certified by the Board as the result of an election. United Mine Workers of America v. Arkansas Oak Flooring Co., 351 U.S. 62, 72, 76 S.Ct. 559, 100 L.Ed. 941 (1956); Colson Corporation v. N. L. R. B., 347 F.2d 128, 135 (8th Cir. 1965), cert. denied, 382 U.S. 904, 86 S.Ct. 240, 15 L.Ed.2d 157 (1965); N. L. R. B. v. Philamon Laboratories, Inc., 298 F.2d 176, 179 (2d Cir. 1962), cert. denied, 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962). If, however, there had been substantial evidence to show that Respondent doubted in good faith that the Union represented a majority of its employees in the appropriate unit, it could justifiably refuse to recognize and bargain with the Union, until the latter's claim had been established through the procedure of a Board election. N. L. R. B. v. Comfort, Inc., supra. Respondent predicates its good faith doubt of the Union's majority status on the fact that it was unaware of the composition of the bargaining unit. Respondent's Vice-President, John Ralph, did express some misgivings as to whether Clyde Nelson and Donald Higgins, supervisory employees of Respondent, were excluded or included in the unit the Union sought to represent. Ralph also stated that Galbraith did not express to him whether he intended to include clerical employees, truck drivers, and shipping employees within the unit. The fact remains, however, that even apart from these disputed employees, the Union still represented a substantial majority of Respondent's employees at all times.[4] Counsel for Respondent in the trial stipulated that the Union represented a *majority of Respondent's employees at the time of the request for recognition,* though he would not specify the extent of the majority.

■■■ At no time, moreover, did either of the Ralphs verbally express any doubt as to the Union's majority

status. They refused to submit the authorization cards to a mutually acceptable third party to verify the Union's claims. Their failure to give the Union any opportunity to substantiate its claims of representation is inconsistent with the assertion of good faith. In view of the Union's substantial majority and Respondent's subsequent conduct, the Board was justified in concluding that Respondent withheld recognition, not as the result of a good faith doubt, but in order to undermine support for the Union and dissipate the very majority which it contended was in doubt.

## THE REMEDY

In the final analysis, however, Respondent contends that, even assuming that the Board's findings and conclusions are supported by substantial evidence, the Board nevertheless exceeded its powers in issuing a bargaining order, rather than directing a second election. Petitioner, on the other hand, asserts that a second election is not an appropriate remedy, in that experience has demonstrated that a majority of rerun elections favor the party who has interfered with the original election.

■■■ In view of our holding that Respondent has failed to recognize and bargain with the Union in good faith at a time when it represented a majority of Respondent's employees, we find no alternative but to enforce the Board's remedy for the 8(a) (5) violation. A ruling, suggested by Respondent, that would condition the Board's bargaining order on the outcome of a second election, would be inconsistent with our determination of a 8(a) (5) violation.

In summary, we hold: (1) the Board's findings that Respondent violated Section 8(a) (1) by interrogation, and by granting pre-election benefits are not supported by substantial evidence; (2) the Board's findings that Respondent violated Section 8(a) (1) by creating

4. The evidence disclosed that if the disputed truck drivers, janitors, receiving or shipping clerks had been excluded, the appropriate unit would then have numbered twenty-three instead of twenty-six employees.

the impression of surveillance and by granting post-election benefits are supported by substantial evidence; (3) the Board's finding that Respondent violated Section 8(a) (5) by refusing to bargain is supported by substantial evidence.

The Board's findings and order are accordingly modified, and as modified, enforcement is granted.