390 F.2d 824
 NATIONAL LABOR RELATIONS BOARD, Petitioner, and
International Union of United Brewery, Flour, Cereal, Soft Drink and Distillery Workers of America, AFL-CIO, Intervenor,
v.
ARKANSAS GRAIN CORPORATION, Respondent.
 No. 18849.
 United States Court of Appeals Eighth Circuit.
 March 12, 1968.
 Rehearing Denied April 24, 1968.
 
 Harold B. Shore, Attorney, National Labor Relations Board, Washington, D. C., for petitioner; Arnold Ordman, General Counsel, N.L.R.B., Dominick L. Manoli, Associate General Counsel, N.L. R.B., Marcel Mallet-Prevost, Asst. General Counsel, N.L.R.B., and Glen Bendixsen, Attorney, N.L.R.B., on the brief.
 B. S. Clark, of Smith, Williams, Friday & Bowen, Little Rock, Ark., for respondent.
 James C. Paradise and Herbert M. Berman, Cincinnati, Ohio, for intervenor, International Union of United Brewery, Flour, Cereal, Soft Drink and Distillery Workers of America, AFL-CIO.
 Before VAN OOSTERHOUT, Chief Judge, MATTHES, Circuit Judge and HARRIS, Chief District Judge.
 MATTHES, Circuit Judge.
 
 
 1
 This case is before the Court on the petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. §§ 151-168, for enforcement of its order issued March 28, 1967 against Respondent Arkansas Grain Corporation. The Board's order and decision are reported at 163 N.L.R.B. No. 192 (1967). No jurisdictional issue is presented. Upon motion, the Court permitted the International Union of United Brewery, Flour, Cereal, Soft Drink and Distillery Workers of America (Union) to intervene. Intervenor has filed a brief in support of the petition for enforcement.
 
 
 2
 The Board, in adopting the findings, conclusions and recommendations of the trial examiner, found that Respondent had violated Sections 8(a) (1) and 8(a) (5) of the National Labor Relations Act. We grant the Board's petition for enforcement of its order with respect to the Section 8(a) (1) violation and deny the same with respect to the Section 8(a) (5) violation.
 
 
 3
 The asserted unfair labor practices stem from an attempt on the part of the Union to organize the employees of Respondent in its plant at Stuttgart, Arkansas, where it is engaged in the business of producing and selling soybean oil and meal. Respondent, through its plant superintendent and other supervisory personnel, manifested its opposition to the Union in a campaign designed to discourage Union affiliation on the part of individual employees.
 
 
 4
 The campaign was commenced in November, 1965. Pursuant to Section 9(c) of the Act, the Union filed a petition with the Board on January 26, 1966 requesting a representation election and certification. At the representation hearing on February 11, 1966 the parties stipulated for a consent election on February 16th. The Union lost the election by a vote of 42 to 30. Thereafter the Union filed timely objections alleging that the Respondent had coercively interfered with its employees' freedom of choice in the election by interrogation of employees concerning Union meetings and voting intentions and by threats of reduced earnings, reduced working force and the general futility of selecting the Union. The Regional Director sustained these objections and recommended that the election be set aside. Since no exceptions were taken to the Regional Director's report, the Board on April 8, 1966 ordered the election set aside and directed a second election. Contemporaneously with the filing of the objections to the election the Union filed the unfair labor practices charge underlying this case.
 
 SECTION 8(a) (1) VIOLATION
 
 5
 We find no compelling need to recite in detail the evidence upon which the Board predicates its finding of a Section 8(a) (1) violation. The examiner's report exhaustively reviews the pertinent incidents of Respondent's coercive activity. Several employees testified in effect that during the organizational campaign the superintendent of Respondent's plant and other supervisory personnel informed them that the ringleaders of the Union movement would be singled out and fired; that if the Union were designated as the bargaining agent there would be a reduction in the number of employees and working hours; that Respondent would never sign a contract with the Union and thus the employees would have to strike to secure their demands with resultant loss of work for many of them. Although Respondent's officials in general denied the coercive statements attributed to them, the examiner credited the testimony of the employees. Coercive interrogation, threats of reprisal and other acts of interference, such as occurred here, are sufficient to constitute a violation of Section 8(a) (1). N.L. R.B. v. Ralph Printing & Lithographing Company, 379 F.2d 687 (8th Cir. 1967); N.L.R.B. v. Louisiana Manufacturing Company, 374 F.2d 696 (8th Cir. 1967); N.L.R.B. v. Byrds Manufacturing Corporation, 324 F.2d 329 (8th Cir. 1963); Marshfield Steel Company v. N.L.R.B., 324 F.2d 333 (8th Cir. 1963).
 
 
 6
 We disagree with the Board's suggestion that this is a case of flagrant unfair labor practices. Out of the thirty employees who testified at the hearing, only four or five related events of sufficient gravity to demonstrate the proscribed conduct.[1] Nevertheless on the whole record we hold that the Board's finding is supported by substantial evidence.
 
 SECTION 8(a) (5) VIOLATION
 
 7
 Respondent's refusal to bargain with the Union is predicated upon a rather unique factual situation concerning which there is no real controversy.
 
 
 8
 On January 26, 1966, after the inception of the Union's organizational drive, Louis J. Woodall, Special International Representative for the Union, advised Respondent by letter that "a majority of your employees in the production and maintenance department have authorized this organization to represent them for the purpose of collective bargaining in wages, hours and working conditions * * *." Woodall suggested a February 1st or 2nd meeting date for the purpose of recognition and bargaining. This letter was received by Respondent on January 27th. On the next day, January 28th, Respondent also received a copy of the Union's petition for a representation election and certification filed with the Board. On the same date Respondent replied to Union's letter of January 26th and stated in substance that since the Union had petitioned for an election the Respondent assumed that Union desired to have the question of majority representation resolved through that channel. On January 31st C. H. Lindberg, Region Director of the Union, advised Respondent that a majority of its production and maintenance employees had selected the Union as their bargaining agent, that the Union was prepared to demonstrate its majority representation through a check of authorization cards, and that the request for recognition and bargaining should be treated as a continuing demand. In its reply on February 3rd to the Union's second demand the Respondent declined the offer to demonstrate the Union's majority by means of a card check on the basis that such an offer was inconsistent with the pending petition for an election.
 
 
 9
 It stands undisputed that on January 27th and February 1st, the respective dates on which Respondent received the two requests for recognition, the Union had not in fact secured authorization cards from a majority of employees in the appropriate unit. Apart from three laboratory employees and a traffic clerk, whom the trial examiner excluded,[2] there were seventy-three employees in the appropriate bargaining unit. On January 27th and February 1st the Union held thirty-five and thirty-six authorization cards, respectively. Two days thereafter, on February 3rd, the Union received its 37th authorization card, giving it a bare majority of one. By February 7th three more employees had signed authorization cards, bringing the total authorization to forty. Notwithstanding the lack of majority representation on the crucial dates the examiner and the Board concluded that Respondent was obligated, on the theory of a continuing demand for recognition, to bargain with the Union and that its failure to do so justified the finding of a violation of Section 8(a) (5).[3]
 
 
 10
 Preliminarily, we again recognize: (1) although representative status may be determined in a Board conducted election pursuant to Section 9(c) of the Act, such an election is not the only method by which a union may demonstrate that it has been designated by a majority of the employees as their representative in an appropriate bargaining unit. United Mine Workers of America v. Arkansas Oak Flooring Company, 351 U.S. 62, 72 n. 8, 76 S.Ct. 559, 100 L.Ed. 941 (1956); N.L.R.B. v. Ralph Printing & Lithographing Company, supra, 379 F.2d at 692-693; Colson Corporation v. N.L.R.B., 347 F.2d 128, 135 (8th Cir. 1965), cert. denied, 382 U.S. 904, 86 S.Ct. 240, 15 L.Ed.2d 157 (1965); N.L.R.B. v. Philamon Laboratories, Inc., 298 F.2d 176, 179 (2d Cir. 1962), cert. denied, 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962); (2) where a union has obtained valid authorization cards from a majority of the employees in an appropriate unit, the employer is vulnerable to a Section 8(a) (5) violation if, absent a good faith doubt as to its majority status, he refuses to recognize and bargain with the union. N.L.R.B. v. Ralph Printing & Lithographing Company, supra, 379 F.2d at 693; N.L.R.B. v. Comfort, Inc., 365 F.2d 867, 876 (8th Cir. 1966).
 
 
 11
 This background material brings into focus two basic issues at hand: (1) Does an employer commit an unfair labor practice by refusing to recognize and bargain with a union upon request when the union admittedly did not represent a majority of the employees in the appropriate unit at the time it asserted its majority status and demanded recognition and bargaining? (2) Where the union, although representing only a minority of the employees at the time of the request for recognition and bargaining, nonetheless expresses its request in terms of a continuing demand on the employer, does the latter's refusal to recognize and bargain with the union without disputing the union's representative capacity become an unfair labor practice if the union within a reasonable time thereafter obtains valid authorization cards from a majority of the employees?
 
 
 12
 We hold that an employer, irrespective of his motivations, does not violate Section 8(a) (5) by refusing to recognize and bargain with a union, if in fact the union at the time of the demand for recognition does not represent a majority of the employees. The rationale underlying the 8(a) (5) violations in N.L.R.B. v. Ralph Printing & Lithographing Company, supra, and N.L. R.B. v. Comfort, Inc., supra, clearly demonstrates, we believe, that two elements must concur to render a refusal to bargain violative of Section 8(a) (5): (1) a demand for recognition and bargaining by a union validly designated by a majority of the employees as their representative in an appropriate bargaining unit; (2) a refusal to bargain which is not motivated by a good faith doubt of the union's majority status.
 
 
 13
 Here, the Union concededly did not represent a majority of Respondent's employees on either January 27th or February 1st, the dates on which Respondent received the respective Union demands for recognition and bargaining. Absent a majority representation, the Union's demands were meaningless and therefore ineffective to form a basis upon which to predicate an unlawful refusal to bargain. We reach this conclusion irrespective of the fact that the Respondent may not have based its refusal to bargain on a good faith doubt as to the Union's majority.[4] An employer's motivations behind his refusal to bargain become relevant only if in fact a majority representation does exist. See, e. g., Crawford Manufacturing Co. v. N.L.R.B., 386 F.2d 367, 372 (4th Cir. 1967); N.L.R.B. v. Heck's Inc., 386 F.2d 317, 321-322 (4th Cir. 1967); N.L.R.B. v. S. E. Nichols Company, 380 F.2d 438, 441-442 (2d Cir. 1967); N.L.R.B. v. Koehler, 328 F.2d 770, 773 (7th Cir. 1964).
 
 
 14
 Our conclusion, moreover, is reinforced by the fact that if Respondent at the time had acceded to either of the Union's demands for recognition and bargaining in the mistaken belief that Union did represent a majority of the employees, both might have engaged in an unfair labor practice in violation of Sections 8(a) (1) and 8(b) (1) (A) of the Act. Section 7 of the Act accords employees the right to reject as well as accept the principle of collective bargaining through representatives of their own choice. In such a hypothetical situation Respondent's grant of exclusive bargaining status to a union selected by a minority of employees would have forced that union upon the nonconsenting majority, thereby interfering with the majority's right to refrain from self-organization. See International Ladies, Garment Workers' Union, AFL-CIO v. N.L.R.B., 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961).
 
 
 15
 The remaining issue for determination is whether the Respondent's refusal to recognize and bargain with the Union assumes a different posture in view of the fact that the Union requested the Respondent to treat its second demand for recognition as a "continuing demand." The Board found that in each of its respective demands the Union "honestly but mistakenly" assumed that it represented a majority of Respondent's employees. The Board adopted the position that Respondent's "peremptory" refusal to recognize or bargain with the Union obviated the necessity for the Union to tender another formal demand for recognition when it obtained a majority status and permitted the Union to treat its last written demand as continuing for a reasonable time until it had attained a majority of forty authorization cards on February 7th.
 
 
 16
 We reject the theory that the Union's formal request for recognition, embodied in its letter of January 31st, amounted to a valid continuing demand upon the Respondent to recognize and bargain with the Union up to the point when it achieved its majority status. If, as we have held, the original demand itself is wholly ineffective to create any rights or obligations in the respective parties by reason of a lack of majority representation, a fortiori, it cannot form the basis for the expression of a valid continuing demand on the Respondent, the rejection of which would amount to a refusal to bargain.
 
 
 17
 In support of its continuing demand theory the Board places great emphasis upon the decision of the District of Columbia Circuit in Local No. 152 v. N.L.R.B., 120 U.S.App.D.C. 25, 343 F.2d 307 (1965). In that case the employer on two occasions outrightly rejected a union demand for recognition at a time when the union purported to represent, but did not in fact represent, a majority of the employees. The Board construed the union's conduct as a continuing demand for recognition under circumstances where a formal demand would have proved futile. The Court of Appeals adopted this approach and held:
 
 
 18
 "An employer violates Section 8(a) (5) when, as here, it rejects a Union's bargaining request, made in the honest but mistaken belief that a majority has been obtained, without questioning the Union's representative status, and the Union does obtain a majority shortly after such request." 343 F.2d at 310.
 
 
 19
 We are not persuaded by the reasoning of the District of Columbia Circuit to modify our holding in this case. The conduct of the Union in the case at bar belies its assertion of an "honest but mistaken" claim of majority representation at the time of its demands for recognition. The record refutes the good faith of the Union in submitting its demands for recognition on the basis of its representation at that time. Neither Louis J. Woodall nor C. H. Lindberg, the Union representatives who authored the written demands for recognition, testified at the hearing as to the basis for the Union's belief that it had a majority. Apart from the disputed status of the four employees, whom Respondent contends should have been included in the unit, the composition and size of the appropriate bargaining unit were readily ascertainable at the time the Union presented its demands.
 
 
 20
 Indeed, the very inclusion of the provision for a continuing demand in the second request for recognition on January 31st carries with it a tacit acknowledgment that the Union either knew it had no majority or had serious doubts as to the existence of its majority status. If the Union had the majority backing and a means of demonstrating that status a demand for recognition accompanied with the requisite offer of proof was sufficient to establish Respondent's obligation to bargain and consequential liability for a refusal to bargain, absent a good faith doubt. Since the rights and liabilities of the respective parties were fixed as of that date, a "continuing demand" had no operative effect to change the status of the parties, and therefore no independent significance, except perhaps from a desire on the part of the Union to have a demand for recognition on record when and if it ultimately achieved its majority status.
 
 
 21
 The unfair advantage which may accrue to a union which predicates its right of representation upon a continuing demand when it knowingly has not secured valid authorization cards from a majority of the employees in the appropriate unit is readily evident. If such a procedure is sanctioned, a union may assert a continuing demand even though it has secured authorization cards from only a substantial minority of the employees. If the employer fails to accede to the demand without disputing in any manner the union's representative capacity, the foundation has been laid for a Section 8(a) (5) violation in the event the union in its campaign among the employees ultimately succeeds in obtaining valid cards from a majority. Such a practice is fraught with perils not only for the employer, but for the employees. We believe that the standard of good faith imposed upon the employer applies with equal force to a union, and that it should not be placed in a position where it may secure an unfair advantage to the possible detriment of all other interested parties.
 
 
 22
 The Board argues, however, that even if the facts here did not establish a technical violation of Section 8(a) (5) since the Union did not represent a majority at the time of the formal demand for recognition, the Respondent's violation of Section 8(a) (1) and its rejection of the collective bargaining principle nonetheless clearly warrant a bargaining order. We disagree.
 
 
 23
 This contention proceeds on the theory that the conduct of Respondent giving rise to the 8(a) (1) violation was so coercive and aggravated as to effectively dissipate the employees' support for the Union and impair the Union's chances of prevailing in a second election. We do not doubt that a bargaining order rather than a cease and desist order may at times be an appropriate remedy to restore the status quo, particularly where the union's support among the employees has been chilled as the result of the employer's unfair labor practices, the effects of which might vitiate any strong union support in a subsequent election. See, e. g., Wausau Steel Corporation v. N.L.R.B., 377 F.2d 369, 373-374 (7th Cir. 1967); United Steel Workers of America v. N.L.R.B., 126 U.S.App.D.C. 215, 376 F.2d 770, 772-773 (1967), cert. denied, Northwest Engineering Co. v. N.L.R.B., 389 U.S. 932, 88 S.Ct. 297, 19 L.Ed.2d 285 (1967). As stated above, Respondent did not engage in any outrageous or aggravated conduct. We do not believe therefore that its conduct, though in violation of Section 8(a) (1), would have such a substantial impact on the employees' freedom of choice in a second election as to render nugatory the effect of a cease and desist order. We agree with the principles enunciated in N.L.R.B. v. S. S. Logan Packing Company, supra, where the Court aptly stated the circumstances under which a bargaining order may be the appropriate remedy for violations of Section 8(a) (1):
 
 
 24
 "In those exceptional cases where the employer's unfair labor practices are so outrageous and pervasive and of such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had, the Board may have the power to impose a bargaining order as an appropriate remedy for those unfair practices. Then it is imposed without need of answering the question whether the union ever obtained majority status. The remedy is an extraordinary one, however, and, in light of the guaranty of § 7 of employees' rights not to be represented, its use, if ever appropriate, must be reserved for extraordinary cases." 386 F.2d at 570-571.
 
 
 25
 Cf. N.L.R.B. v. Flomatic Corporation, 347 F.2d 74 (2d Cir. 1965).
 
 
 26
 In summary, viewing the record as a whole, we are satisfied that the matter of choosing a bargaining representative for Respondent's employees should be determined through the process of another Board election.
 
 
 27
 In accordance with the views herein expressed, enforcement is granted in part and denied in part.
 
 
 
 Notes:
 
 
 [1]
 The other employees who testified merely identified the authorization cards which they had signed
 
 
 [2]
 Respondent urged before the Board and contends here that the three laboratory employees and the traffic clerk should not have been excluded from the bargaining unit. Although there is substance to Respondent's contention in this regard, we do not decide that question in view of our disposition of the Section 8(a) (5) issue
 
 
 [3]
 On two occasions, February 12th and February 14th respectively, a total of seven of Respondent's employees, at the direction of a Board representative, wrote to the Board's regional office in Memphis, Tennessee stating (1) that they no longer wished to be represented by the Union and (2) that their authorization cards be cancelled and returned to them. Both letters indicated that a copy had been sent to Mr. Woodall, the Union's representative. The Board contends that inasmuch as the evidence failed to show that the Union had actually received notice of the withdrawal of authorization, the letters were ineffective to that end. In view of our disposition of the case we do not reach the question of the validity and effect of the withdrawal letters. If they were effective, the Union did not represent a majority of the employees at any time prior to the election
 
 
 [4]
 While we need not reach the issue whether Respondent's refusal to bargain was prompted by a good faith doubt as to the Union's majority status, we do not share the Board's characterization of Respondent's conduct as an outright and adamant refusal to bargain without a good faith doubt of majority status. The Board construed the Union's second letter as a continuing demand for recognition on the basis of Respondent's "peremptory" refusal to bargain. Respondent's reply on February 3rd to the Union's second demand for recognition, while purporting to reject a demonstration of majority status by means of union authorization cards, is not tantamount to an admission of majority status or an acknowledgment that the Respondent did not in good faith doubt that status. In short, Respondent's letter does not negative the existence of a good faith doubt but only questions the method by which the Union seeks to prove its majority status. While this Circuit has accepted a demonstration of majority status on the basis of valid authorization cards, we are nonetheless mindful of the vices and pressures inherent in their unsupervised solicitation. In a proper case therefore authorization cards may be a totally unreliable indication of majority status and constitute a sufficient basis for the employer to entertain a good faith doubt as to that status. See, e. g., N.L.R.B. v. S. S. Logan Packing Co., 386 F.2d 562 (4th Cir. 1967)